ROSE PITTMAN v. PILLSBURY FLOUR MILLS, INC.; AND ANOTHER.[1]

July 13, 1951.

No. 35,536.

*Snyder, Gale, Hoke, Richards & Janes,* for relators.
*Samuel I. Sigal,* for respondent.

LORING, CHIEF JUSTICE.

This case comes to us on certiorari to the industrial commission to review an award of compensation to a widow, Rose Pittman, whose husband, Ernest F. Pittman, died of cancer. Hearings were held before a referee, who made findings in favor of respondent, the widow. Relators, the employer and its insurer, appealed from the referee's findings. The industrial commission affirmed the referee's findings, but made certain arithmetical changes in his determination of damages. Relators were held liable for compensation during dependency not to exceed the total sum of $10,000.

May 1, 1946, Ernest F. Pittman, who was then about 47 years of age, was employed by Pillsbury Flour Mills, Inc., as a safety man. His work consisted of going through employer's mill, checking dangerous places, and making and installing guards to protect employes of the mill. May 1, 1946, he was making a metal guard and, in the process, was drilling a piece of heavy iron with an electric drill using a ¼-inch bit. The piece of iron was in a vise. The drill was of the hand type with a trigger like a pistol. He had the drill in his right hand, with his right index finger on the trigger and his left hand supporting the drill. He was leaning his body against the back of the drill, which was hexagon-shaped and weighed approximately six pounds.

When a hole is drilled through a piece of metal, the bit of the drill may catch on a small particle of metal and will then go through faster than it is drilling. When the bit encounters a slightly thicker piece of metal, it may catch and stop, but the motor continues. This causes the drill to jump. While employe was drilling iron on

the day in question, his drill jumped, presumably in the manner described above. In any event, the drill suddenly turned in his hands, and the body of the drill hit him on the nipple of the right breast. He had immediate pain in the right breast, and it was particularly sharp for a few minutes after the accident. However, he continued to work the remainder of the afternoon until quitting time at 4:30 p. m. By 5:15 p. m., the area that had been struck by the drill began to swell and discolor a little. That same evening, about 7 or 8 p. m., employe's wife massaged the injured area first without alcohol and later with alcohol. The injured area was swollen and red but not hard. By bedtime that evening, there was an area of swelling and discoloration which the Pittmans estimated to be approximately 1½ inches in diameter around the nipple of the right breast. Employe had never had any swelling or discoloration in the right breast prior to the accident.

Between May 1, 1946, and July 25, 1946, Mrs. Pittman frequently massaged the injured area. The discoloration of the injured area was at first reddish, later slightly bluish, and still later slightly yellowish. The swelling increased, becoming a little harder or tighter between May 1 and July 25, 1946. Soreness in the injured area continued for one week or more after the accident. The soreness disappeared, but the swelling slowly continued. July 25, 1946, employe went to Dr. Edward Alger, employer's company doctor. At the time the swollen area was becoming a little hard, and the nipple of the right breast had sunk back a little into the swelling. On the same day, Dr. Alger referred employe to Dr. A. T. Hays, who made a general physical examination, which showed employe's health to be essentially normal, except for the condition of his chest. Dr. Hays made the following statement about Pittman's breast injury:

"* * * There was noted on his chest at examination and in the right breast underlying the tissues a mass underlying the tissues approximately 2½" in diameter. It is firm and feels somewhat nodular and underlies the nipple and areola and extends outward peripherally and it is not tender and it is attached to the underlying

skin with evidence of dimpling and retraction of the nipple. It does not appear to be attached to the underlying fascia. There were no palpable axillary infra or supra clavicular nodes. The left breast was normal. Blood examination was done at that time which revealed a hemoglobin of 94, white blood cell count of 7,000 and a red blood count of 5,000,000. Urine examination was also done which was found to be normal. X-ray was taken of his chest at Dr. Hanson's office which was reported as being normal chest."

An examination of the abdomen was also made at the same time. With respect to this examination, Dr. Hays reported as follows:

"An examination of the abdomen revealed no masses, tenderness or hernia. The liver is not palpable nor are there any palpable masses beneath the rib region. The spleen was not palpable."

After making the above examination, Dr. Hays made a tentative diagnosis of employe's ailment as being tumor of the right breast and possible carcinoma. He recommended surgery to remove the tumor and such other treatment as might be indicated by a microscopic identification of the tumor.

A few days later, August 1, 1946, employe was admitted to Northwestern Hospital, and an operation was performed on that date. A right breast tumor and the nipple of the right breast were removed. A radical mastectomy or resection was performed. A frozen section or biopsy was performed on the tumor. The pathologist reported a miscroscopic specimen showing a tumor measuring 5 cm. in diameter, grossly malignant, with axillary nodal involvement. In the microscopic specimen, the glandular elements on the breast showed malignant degeneration. A section of the axillary node revealed cords and glandular structure replacing most of the normal structure. The diagnosis by the pathologist was carcinoma of the right breast, scirrhous type, with axillary metastasis.

The employe was confined in Northwestern Hospital from August 1 until August 30, 1946. On October 14, 1946, he returned to work.

After he returned to work, his right arm remained painful and weak. If he worked too hard, his right arm would swell and become tight. In April 1947, he went to Rochester, Minnesota, for an examination at the Mayo Clinic. He continued working from October 14, 1946, until November 24, 1949, except for a four-month period in 1948 and a three-day period in 1949 when he was suffering from skin trouble and unable to work.

On November 24, 1949, employe was compelled to cease work because of coughing and weakness. He remained away from work continuously from November 24, 1949, until he died February 26, 1950. During his last illness, when he suffered from coughing and weakness, he was being treated by Dr. W. A. Sawatzky.

February 28, 1950, an autopsy was performed. The autopsy findings, as testified to by Dr. Moses Barron, were as follows:

"* * * The right breast was absent; lymph nodes were enlarged and involved definitely with the tumor; the lungs were not only destroyed, but they were really enlarged with the massive infiltration. Then the rib that was very greatly involved with a large mass of tumor and involvement of both adrenals, the findings were very obvious. Very massive metastatic carcinoma, most likely primary in the breast which had been operated on, with the report that came from the operation of an adenocarcinoma of the scirrhous type."

Respondent called four doctors as expert witnesses; relators called two, one of them a pathologist. Their testimony will be set forth as it becomes pertinent.

█ Relators' principal assignment of error is that the evidence is insufficient to support the industrial commission's finding that employe's total disability from November 24, 1949, to February 24, 1950, and his death on February 26, 1950, resulted from his accidental injury on May 1, 1946. The gist of relators' contention in this case is that, because of inadequate medical knowledge relating to cancer, it is impossible to prove that this particular cancer was either caused or its course of development accelerated

by the injury which plaintiff's husband sustained in his work; hence, that any finding on these matters rests entirely upon speculation and conjecture. It is relators' contention that employe's cancer predated his injury; that at the time of the injury the cancer had already spread to such an extent that successful operation was impossible; and that employe's ultimate disability and death from the cancer were certain, in all events, and most likely to occur within five years. The principal point which relators seek to make is summarized in the following excerpt from page 31 of their brief:

"* * * It has been our purpose to direct the attention of this Court to the testimony as to this particular case—to the lack of any facts to show that this cancer was either actually aggravated by the alleged accident and to the fact that we could have had exactly the same sequence of events in the natural course of this disease without the intervention of any accident whatsoever. It is submitted that the connection between the accident and the death some three and one-half years later is so remote as to be utterly speculative and conjectural from the point of view of causation."

The medical testimony relating to the issues raised in this case can be summarized broadly as follows: Only one of the six doctors who testified—Dr. Barron—was of the opinion that employe's injury initiated the cancer. Some of the doctors thought that cancer is not caused by a single injury. Although five of the six doctors thought that employe's cancer predated his injury, only Dr. Larson was of the opinion that it was a most likely possibility that inoperable metastasis had developed prior to the injury. Three of the six doctors expressed their opinion that a preëxisting cancer had been aggravated and its growth and spread accelerated by employe's injury. Dr. Barron, who believed that employe's cancer was initiated by his injury, nevertheless agreed with the other three doctors in the respect that if there was a preëxisting cancer it

would be his opinion that the dormant cancer had been aggravated and its growth and spread accelerated by the injury.

In this case, we have been presented with a rather elaborate discussion of medical theories as to the possibility of a cancer being caused or aggravated by trauma. It was conceded by all of the doctors who were witnesses that the medical profession has incomplete knowledge concerning the causes of cancer and the factors influencing its growth and spread in the human body. The theories which the profession has developed are in large part based upon empirical studies. Since we, as judges, lay no claim to expertness in these matters, we can add nothing to the discussion, nor can we be expected to resolve those conflicts which the medical profession itself has been unable to resolve. Notwithstanding this uncertainty, we think that we are bound to treat the opinions of these doctors as something more than speculation and conjecture, which are but polite terms for unscientific guesswork.

In Austin v. Red Wing Sewer Pipe Co. 163 Minn. 397, 399, 204 N. W. 323, 324, decided in 1925, when less was known of cancer than is known today, the same argument was apparently made which relators are making here. There the court stated:

"Any uncertainties that may be in this record because one of the doctors said that the causes of cancer are not definitely known; that cancer seldom comes from an injury; that there are a number of different theories advanced by the medical profession as to the cause of cancer, but they are all theoretical; that it is speculative to advance an opinion that the condition in this case was due to the injury, do not reach the state of being conjectural (which is a mere guess, 12 C. J. 503), as claimed by appellant."

In numerous cases to date, findings relative to initiating or aggravating cancer by trauma have been attacked as being unsupported by the evidence, and the matter has been variously decided.[2] In

2Gaetz v. City of Melrose, 155 Minn. 330, 193 N. W. 691; Austin v. Red Wing Sewer Pipe Co. 163 Minn. 397, 204 N. W. 323; Storing v. Hotel Radisson Co. 177 Minn. 519, 225 N. W. 652; Halper v. The Golden Rule, 180

Hertz v. Watab Paper Co. 184 Minn. 1, 3, 237 N. W. 610, 611, this court stated:

"We have often held in particular cases that trauma may be found from the evidence to be the primary or the exciting cause of sarcoma, and we have sustained a contrary finding."

In the present case, it appears that the industrial commission based its award primarily upon a finding that employe's injury aggravated a preëxisting cancer. The opinion of the commission stated:

"The evidence as a whole, in our opinion, establishes with reasonable certainty that the employe's death was hastened because of the injury he suffered in the course of his employment."

Whether the industrial commission based its award upon a finding that a cancer was caused by the injury or upon a finding that a preëxisting cancer was aggravated makes little difference in the present case, because a finding of either will support the award made. An injury is compensable whether it causes a disease or merely aggravates an existing infirmity. Hogan v. Twin City Amusement Trust Estate, 155 Minn. 199, 193 N. W. 122; Gaetz v. City of Melrose, 155 Minn. 330, 193 N. W. 691; Hertz v. Watab Paper Co. 180 Minn. 177, 230 N. W. 481.

Although the absence of exact medical knowledge on the cause of cancer makes it impossible to say with absolute certainty whether a particular injury caused or aggravated a particular cancer, we are hardly compelled to say that a finding of cause and effect in a given case is without support in the evidence because such tenuous uncertainty exists. A great many findings made by juries, courts, and other triers of fact rest upon something less than absolute certainty. In Hogan v. Twin City Amusement Trust Estate, 155 Minn. 199, 193 N. W. 122, this court properly remanded a case because the commission applied the incorrect rule that the relation

Minn. 477, 231 N. W. 195; Hertz v. Watab Paper Co. 180 Minn. 177, 230 N. W. 481; *Id.* 184 Minn. 1, 237 N. W. 610. See, also, Hogan v. Twin City Amusement Trust Estate, 155 Minn. 199, 193 N. W. 122.

of cause and effect should be proved by clear and satisfactory evidence which would not leave the trier's mind in doubt.

In the present case, employe appears to have been a healthy man prior to his injury. He experienced severe pain when he was injured, and physical signs of injury at the place of trauma developed shortly thereafter in the form of swelling and discoloration. It is conceded that he had cancer within two months after his injury occurred. He was never the same in health after his injury occurred or after his operation. In short, he was a man in apparently good health; he was injured; his general health was normal even two months after the injury except for the injured area; he never recovered his health from the day of his injury to the day of his death. On this evidence alone there is a strong inference of cause and effect. In this respect, the decision of the industrial commission is supported by what we said in Austin v. Red Wing Sewer Pipe Co. 163 Minn. 397, 398, 204 N. W. 323, 324, where an injury on a man's cheek was followed by cancer a year and a half later:

"* * * The employe in the course of his employment suffered an injury, upon his cheek, at a place previously free from blemish. Under constant care, it developed a malignant growth which was eventually diagnosed as cancer. The circumstance alone is pretty strong evidence that the injury was the proximate cause of the result, and would be quite convincing to the mind of a layman. There is no apparent break in the chain of causation. If the medical profession conceded that it did not know the cause of cancer, the connecting events between the cause and effect in this case might be sufficient to justify the conclusion that the injury was the legal cause and that the result should be compensable."

Again in Hertz v. Watab Paper Co. 184 Minn. 1, 3, 237 N. W. 610, 611, the court quoted with approval the following statement from Winchester Milling Corp. v. Sencindiver, 148 Va. 388, 395, 138 S. E. 479, 481:

"* * * taking a common sense, practical view, as courts and commissions must take of the ordinary happenings of life, boiled down to its last analysis the medical theory is that there is a relationship between the receipt of injury and origin of sarcoma, and that the degree of injury plays no important part. With this in mind we find a perfectly healthy, strong man who has never lost any time from work or complained of any illness, suffers an injury and from that time on is incapacitated, grows worse and worse, sarcoma develops at the point of injury, from which he dies. The lay mind, under such circumstances, can reach no other conclusion than that reached by the Commission, viz: that the sarcoma was either caused by the injury or was aggravated by it."

In the present case, there was a factual basis for inferring a relationship of cause and effect between employe's injury and his subsequent disability and death. There was also opinion evidence given by well-qualified doctors which supported a finding of cause and effect. In such circumstances, we are unable to say that the industrial commission's finding rests upon speculation and conjecture or that it is not supported by the evidence. We must therefore affirm the industrial commission's finding that employe's disability and subsequent death resulted from the injury which he sustained in the course of his employment.[3]

■ The second issue in this case relates to the amount of benefits to which respondent is entitled. In May 1946, when employe was injured, the maximum death benefit which could be awarded to an employe's widow was $7,500.[4] However, by L. 1949, c. 540, § 4, that section of our compensation act was amended, effective July 1949, so as to increase the maximum death benefits from $7,500 to $10,000. The question presented is whether the law in effect at the time of employe's injury or the law in effect at the time of his death governs in determining the maximum benefits to which his widow is entitled. The industrial commission determined that the law in effect at the time of employe's death governs. This deter-

[3]See cases cited in footnote 2, *supra*.
[4]M. S. A. 1945, § 176.12, subd. 19.

mination is in accord with our decision in State ex rel. Carlson v. District Court, 131 Minn. 96, 154 N. W. 661. Although we recognize that other courts have viewed the matter differently,[5] the case before us is not distinguishable from the Carlson case, and we are therefore bound by it. The Carlson case was decided upon the ground that the widow's claim for compensation does not arise from the injury to her husband, but is a new and distinct right of action created by his death. That is still the prevailing interpretation of the death-benefits provision of our compensation act. See, Warner v. Zaiser, 184 Minn. 598, 239 N. W. 761; Johnson v. Pillsbury Flour Mills Co. 203 Minn. 347, 281 N. W. 290; Dale v. Shaw Motor Co. 206 Minn. 99, 101, 287 N. W. 787, 788; Todeva v. Oliver I. Min. Co. 232 Minn. 422, 45 N. W. (2d) 782. We must therefore affirm the industrial commission's determination that respondent's rights are fixed by the law in effect at the time of her husband's death.

Affirmed.

[5]Wallin v. General Motors Corp. 317 Mich. 650, 27 N. W. (2d) 122; Bay Trust Co. v. Dow Chemical Co. 326 Mich. 62, 39 N. W. (2d) 244; Thorpe v. Dept. of Labor and Industries, 145 Wash. 498, 261 P. 85; Annotation, 82 A. L. R. 1244, 1245, and cases cited.