## WILLARD ERICKSON v. EVERETT KNUTSON AND ANOTHER.[1]

June 20, 1952.

No. 35,752.

*Reynolds & McLeod,* for relators.

*C. E. Warner* and *Ralph Foster,* for respondent.

[1]Reported in 54 N. W. (2d) 118.

KNUTSON, JUSTICE.

Certiorari to review an order of the industrial commission awarding compensation and medical benefits to employe.

Willard Erickson was employed by Everett Knutson as an electrician from February 12, 1948, until about March 1, 1949. Prior to that employment, he had worked as an electrician for another concern for about a year and a half. From November 14, 1944, to June 26, 1946, he served in the United States navy. At the time of the commencement of the hearing on September 27, 1950, he was 26 years of age.

As long as he could remember, employe had a growth on the front of his right leg some four or five inches below the knee. Originally about the size of a pencil top, it grew as he grew and continued to grow gradually during the time he was in the navy. About six months before April 1948, he noticed that there was some increase in the rapidity of its growth. He described the growth itself as being about an inch to an inch and a quarter in height and an inch to an inch and a half in diameter in April 1948. It had a slight blue color, in streaks, on both sides from what he thought were veins. The growth itself did not cause him any discomfort, but did bother him slightly when he bumped it, this minor irritation becoming somewhat more noticeable as he grew older. It was as hard as his shinbone. His testimony regarding the growth of the tumor during the period immediately preceding his alleged injury is important. His statements are as follows:

*On direct examination:*

"Q. Now, Willard, had this tumor or growth that you mentioned on the right shin bone, had that been increasing in size noticeably prior to April of 1948?

"A. Well, it had, according to my knowledge, which is kind of hard to say, too, that it had been growing, but to my knowledge it looked like it had been growing slightly in the last six months prior to my hospitalization."

*On cross-examination:*

"Q. Isn't it a fact that from the time you entered the Navy until you were discharged from the Navy that there was an increase in the size of this particular growth?

"A. Yes, some.

"Q. Enough so that you knew that it was larger than it had been when you went in?

"A. Yes."

*In the statement taken before hearing:*

"Q. And did it ever get any larger? Did it change at all at any time?

"A. Well, it—it kept growing, you know, gradually, but—well, the last six months was really when it grew the most.

"Q. Yes.

"A. But, otherwise, it was just a steady, gradual growth.

\* \* \* \* \*

"Q. And you say that you did notice there was a noticeable growth let us say in the past six months?

"A. Yes.

\* \* \* \* \*

"Q. But in the last six months before this thing came to a head there was a noticeable increase in the growth of the tumor?

"A. Well, it was—it kind of come out more on the sides.

"Q. Yes.

"A. And that's really where I noticed it was growing. It kind of come out in little bulges.

"Q. The growth was very gradual to the point where it wasn't very noticeable until the last six months, when you began to notice it was taking on considerably larger form?

"A. Yes."

On the afternoon of April 19, 1948, employe was engaged in doing some electrical installation work on a farmhouse for employer. While he was working on a ladder, his right foot slipped, causing him to fall down the ladder about two rungs or about the full length of his arms before he could stop himself. In the course of the fall,

the growth on his right leg struck against the rungs of the ladder. He immediately got down from the ladder and examined the growth. There was no severe pain, but there was a slight redness toward the right side. He continued to work for the balance of the day, but when he went home that evening the growth began hurting "pretty bad," so his wife put hot packs on it. When he looked at the growth that night, it was slightly more blue than it had been previously— "something on the order of a bruise" which appeared on the top on the right side of the growth.

Employe returned to work the next day. His leg hurt him slightly, so his working companion did the work which entailed crawling and climbing. The slight blue color remained.

On April 21, 1948, employe again injured the growth. On that occasion, while working in a dark basement, he accidentally stepped down from a chair into a metal kettle with his right foot, striking the growth against the inner side of the kettle. He had considerable pain from this injury, and that night he went to a doctor, who ordered X rays taken. The doctor reported that from his examination the growth was discolored, red and blue, and was "soft on the top by the skin, as if it had had a recent bruise or injury." It was unlike the ordinary bruise, in that it was not soft all over, but had a hardness underneath. The X rays were taken April 26, 1948. Employe stopped work on April 29, and on April 30 he went to the Veterans Hospital in Minneapolis. There, a biopsy was performed on the right leg several days later, and a small piece of the growth was removed. Upon analysis, it was found to be malignant—an osteogenic sarcoma.[2] The leg was amputated above the knee on May 13, 1948, and thereafter a pathological examination was made. The pathologist reported that his examination showed a smoothly

[2]Certain medical terms used in describing the growth are not easily understood by nonmedical persons. In order that such terms as used herein may be understood, the following definitions have been taken from the record:

CHONDROMA—A benign mass composed primarily of normal cartilage, usually found on the surface of the long bones.

SARCOMA—A fast-growing malignant growth of bone or tissue, classified

rounded swelling on the tibia, either attached to it or part of it, and that the skin was movable over it. The dimensions of the growth were given as 7½ centimeters long, 4½ centimeters wide, and 1½ centimeters above the normal surface of the tibia. The upper edge of the growth began 5 centimeters below the very top of the tibia. It was covered by a normal periosteum, except where the biopsy had been taken. It was the opinion of the pathologist that the malignancy had started on the surface of the tibia, because the bulk of it was on the surface of the bone and only a small amount was present in the bone and in the marrow.

The industrial commission found that the growth on employe's leg had become malignant prior to his first injury on April 19, 1948, but that the evidence established that the injuries aggravated the sarcomatous condition present and was therefore compensable.

As is usual in cases of this kind, the medical experts called by the respective parties differ radically as to whether trauma can aggravate a malignant tumor or growth such as we have here, and, if so, whether the injuries suffered by employe did aggravate the pre-existing condition of his infirmity. Employer contends that the evidence does not justify a finding that the injuries sustained by employe in any way aggravated the growth which the commission found had become malignant prior to such injuries. While it is not practical to set forth in detail the opinions of the doctors called or the reasons for such opinions, a brief summary thereof may indicate the wide divergence of their views.

Employe called Dr. D. C. Anderson, a general practitioner who first examined him. It was the opinion of Dr. Anderson that the two bumps caused the tumor, which had theretofore been benign, to become malignant. Dr. Donald Gleason, a pathologist at the

under the general term *cancer*.

CHONDROSARCOMA—The malignant counterpart of the chondroma.

OSTEOGENIC SARCOMA—All tumors of sarcomatous nature arising from bone; likewise osteo chondroma.

PERIOSTEUM—The membrane that covers the bone.

METASTASIS—Spread of the tumor to other parts of the body, particularly the lungs.

Veterans Hospital, was of the opinion that the malignancy had been present prior to the accidents. He was not asked for his opinion as to whether the bumps aggravated the existing condition of the tumor. Employe next called Dr. Fred Wittich, whose opinion, based on a hypothetical question, was as follows:

"Q. What is that opinion?

"A. I am of the opinion, based upon this statement of yours and Mr. McLeod's, that at least there was a bony chondroma or cartilagenous tumor which had existed for a number of years, and that it was definitely aggravated or activated by the two injuries which are supposed to have been sustained, and that the growth following these injuries became much more malignant and grew much faster as the result of this trauma, which is extremely common in the history of these tumors and in the few that I have seen.

\* \* \* \* \*

"Q. Is it your opinion that the accidents which have been described to you in the hypothetical caused an earlier amputation of the leg than if the accident had not happened?

"A. Yes.

\* \* \* \* \*

"Q. Would you say it is probable that a chondroma which is aggravated by two accidents which I described in the hypothetical, could be transformed into a malignant tumor?

"A. That is the usual story of all of these chondrosarcomas, that they may start with an extremely small injury or blow. The blow may be so slight that it would not produce any injury on normal tissue. These benign chondromas are potentially malignant and any irritation of injury may start the malignant changes."

Employer called Dr. R. Hultkrans, who stated his opinion, based on a hypothetical question, as follows:

"Q. What is your opinion, Doctor?

"A. It is my opinion that the injuries as described would not have any effect upon the chondrosarcoma.

"Q. Assuming these same facts to be true that I have stated to you, Doctor, have you an opinion as to whether or not the amputation of the leg was in any manner hastened or required because of the fact that these two injuries had occurred?

"A. Yes, I do.

"Q. And what is your opinion?

"A. Well, only in this respect: that the accident probably called it to his attention, and in that way he went to a physician probably sooner than he would have had he not had it done; but as far as causing an earlier amputation I don't think it had anything to do with it because the diagnosis is the thing that necessitates amputation here.

"Q. In your opinion, Doctor, and based upon the same statement of facts that I have given you, assuming this accident occurred on the first bump of which we have a history occurring on April 19, 1948, and the biopsy was done on April 30, 1948, eleven days after, which showed the presence of this malignancy, have you an opinion as to whether or not this malignancy began at or subsequently to the accident of April 19, 1948?

"A. Yes.

"Q. What is your opinion?

"A. It was my opinion that the malignancy was present for a considerable period of time prior to April 19, 1948."

Dr. John F. Noble, a specialist in pathology called by employer, was of the same opinion. He testified:

"Q. And what is your opinion, Doctor?

"A. It is my opinion that the injuries sustained on dates stated had no relationship to the tumor nor to the necessity for its subsequent amputation.

"Q. And will you state your reasons for that opinion, Doctor?

"A. It is my opinion that trauma, injury, is in no way an etiological factor in malignant new growth, nor in my opinion does injury or trauma contribute or accelerate such growth.

"Q. Upon the facts that I have related, Doctor, especially that with reference to the fact that he said that this growth grew as he

grew until about six months before the accident, when it began to grow more rapidly and became noticeably larger, could you state from that whether or not there is reason to believe that malignancy existed in this prior to the time of the accidents?

"A. It would be my opinion that the malignant change in this pre-existing tumor occurred at or about the time that he noticed the increase in the size, that is, approximately six months prior to April 19, 1948."

Dr. Arthur H. Pedersen, whose practice consisted mostly of surgery, but who had specialized to some degree in pathology, stated that in his opinion the accidents "Contributed in no way, either through aggravation or through growth." It was also his opinion that no trauma was applied to the sarcoma, for the reason that the periosteum was not affected. He further stated that in his opinion it is not possible to make a malignancy more malignant by trauma.

■ There is no longer doubt that accidents aggravating an existing infirmity, which lead to temporary or permanent disability, are compensable. Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635; Westereng v. City of Morris, 205 Minn. 219, 285 N. W. 717; Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 8 N. W. (2d) 24.

■ The case now before us is hardly distinguishable from Pittman v. Pillsbury Flour Mills, Inc. 234 Minn. 517, 523, 48 N. W. (2d) 735, 738, which, like this case, involved an injury alleged to have caused or aggravated a sarcoma. What we there said regarding the cause and aggravation of cancer by trauma is equally applicable here:

"* * * we have been presented with a rather elaborate discussion of medical theories as to the possibility of a cancer being caused or aggravated by trauma. It was conceded by all of the doctors who were witnesses that the medical profession has incomplete knowledge concerning the causes of cancer and the factors influencing its growth and spread in the human body. The theories which the profession has developed are in large part based upon

empirical studies. Since we, as judges, lay no claim to expertness in these matters, we can add nothing to the discussion, nor can we be expected to resolve those conflicts which the medical profession itself has been unable to resolve. Notwithstanding this uncertainty, we think that we are bound to treat the opinions of these doctors as something more than speculation and conjecture, which are but polite terms for unscientific guesswork."

In Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 326, 8 N. W. (2d) 24, 25, we said:

"* * * Conflicts in medical opinions, like those in other testimony, must be resolved by the triers of fact. Here there was a direct conflict on the vital issue in the case between the view of employe's doctor and the views of the doctors who testified for the employer. The commission accepted the testimony of Dr. Hengstler and awarded compensation. Under our oft-repeated rule, we cannot go beyond its determination."

After stating that "Seven doctors testified but when the record is read, it is evident that the medical profession is fairly well divided in opinion as to just what causes a sarcoma and as to what part trauma plays when superimposed upon a sarcomatous condition," the commission resolved the conflict in favor of employe. The evidence would support a finding either way. Under these circumstances, we can do nothing but affirm under the well-established rule that—

"* * * A finding upon a question of fact cannot be disturbed unless consideration of the evidence and the inferences permissible therefrom clearly require[s] reasonable minds to adopt a conclusion contrary to the one at which the commission arrived." Jones v. Excelsior Laundry Co. 183 Minn. 531, 532, 237 N. W. 419; Westereng v. City of Morris, 205 Minn. 219, 285 N. W. 717.

Employe is allowed $350 attorneys' fees and costs in this court. Affirmed.