## EDWIN J. SCHOCH v. MINNESOTA MINING & MANUFACTURING COMPANY AND ANOTHER.

76 N. W. (2d) 801.

May 11, 1956—No. 36,704.

*John C. Rowland* and *Tracy, Sinclair & Rowland,* for relator.
*John M. Prins,* for respondents.

MURPHY, JUSTICE.

Certiorari to review an order of the Industrial Commission denying a petition to take additional evidence and affirming the determination of the referee denying compensation and medical benefits to employee for a heart and hernia condition allegedly resulting from an accident occurring on November 16, 1944.

Edwin J. Schoch, now 56 years of age, first began employment at the Minnesota Mining & Manufacturing Company on January 18, 1944. He initially began work as a rubber mixer or rack man. On November 16, 1944, Schoch was engaged at a machine which processed sandpaper. As the material came out of an oven it was run over rollers and wound onto drums. Attached to the machine was a tally bar composed of cold roll steel which was approximately five feet long and one inch in diameter. This tally bar served as an axle for the tally which consisted of a wheel 4½ inches in diameter connected to a motor device which measured the amount of paper that went by on the roller. While adjusting the drums Schoch was struck in the lower left side of the chest and left side of the abdomen by the tally bar. One end of the bar became enmeshed in a drive belt, and, with the other end against his sternum, he was pinned against a pillar. He was carried off his feet momentarily and then lowered as the machine stopped.

Shortly after the accident Schoch reported to the company nurse who sent him by taxi to the office of Dr. Victor Hauser. Dr. Hauser in examining employee noted tenderness over the lower end of the sternum or breastbone and just below the sternum. Several days later on November 20, 1944, employee saw Dr. C. C. Bell who examined the injured area. The doctor found no black-and-blue marks or breaking of the skin. Further examinations were made on the 22nd, 25th, and 28th of November, 1944, and the 1st and 6th of December with no particular findings except for complaints of tenderness on November 28. Employee returned to work on the 4th of December, 1944, and the doctor on December 6 concluded that Schoch would require no further treatment for the injury. Employee received compensation in the sum of $26.67 covering a disability of 2⅚ weeks, and received $29 in benefits for medical care.

After returning to his employment on December 4, 1944, employee continued to work on the winder. On May 12, 1947, he became a general helper or rubber mixer's assistant. The work on this job, among other things, consisted of lifting 4⅑-gallon pails of rubber

mix into a tank 18 inches off the floor and on occasions involved considerable hours of overtime.

The first time that Schoch made any complaint that might indicate a cardiac or heart difficulty was to Dr. Bell on April 8, 1947, some 2 years and 5 months after the accident occurred. The first record of a heart condition, as reflected by his health history at Minnesota Mining, appears during the period December 29, 1949, to January 5, 1950. This record, which appears more than 5 years after the accident, indicates that he had taken a week off because of "pain in chest."

On July 21, 1950, employee first visited Dr. F. A. Thompson who, after several consultations, determined that Schoch suffered from a diastasis recti[1] or abdominal hernia and paraxysmal auricular fibrillation which is an irregular beating of the auricles of the heart. Schoch, because of his physical condition, ceased to work at Minnesota Mining on November 1, 1952. In November 1952, Dr. Thompson collaborated with Dr. Charles Rea in an operation upon Schoch for the diastasis recti and, although a period of comfort followed that operation, a recurrence of the difficulty required a second operation which proved unsuccessful. Dr. Ben Sommers who treated Schoch for his heart condition was first consulted on January 6, 1953.

Employee claims that his diastasis recti and auricular fibrillation conditions are a result of the accident of November 16, 1944, and that as a result he is presently permanently and totally disabled. The referee found that there was no causal connection between these conditions and the accident, and the Industrial Commission affirmed.

The determinative issue therefore is whether there is evidence of a sufficient causal relation between the employee's present heart and hernia conditions and the accident of November 16, 1944. Dr. Thompson, who testified in behalf of the employee, expressed the opinion that there "is some association" between the employee's

---

[1]More specifically diastasis recti is the separation of the fascie, a dense, leathery type of tissue, between the vertical bodies of muscles in the abdominal wall in the mid-line, which in the instant situation permitted serous membrane, lining the interior of the abdominal cavity, to protrude.

physical condition and the accident. While Dr. Sommers supported this opinion he testified on cross-examination that he would expect a person who suffered from auricular fibrillation to seek medical attention at its inception—the condition can occur in normal people and in any organic disorder of the heart causing enlargement "such as rheumatic heart disease or hypertensive heart disease"—and that he would not expect a person who suffered from it as a result of trauma to go several years without seeking medical care.

"Q. If, in fact, he first sought medical care and attention for his chest longer than a year after the accident occurred, Doctor, then your opinion would be that there probably was no connection between the injury and the fibrillation?

"A. If that is a fact, yes, sir."

Dr. Rea, who also testified for the employee, gave as his opinion that the injury described could have produced the hernia or diastasis recti from which the employee suffered.

Contrasted with this testimony for the employee was the comparatively positive testimony of Dr. C. C. Bell and Dr. Charles N. Hensel that the requisite causal relation did not exist. Dr. Bell made a point of the fact that there was no evidence of a direct trauma to the heart and that, owing to the nature of auricular fibrillation, indication of heart trouble would have been expected much before the first complaint on April 8, 1947, some 2 years and 5 months after the accident. Dr. Hensel, on behalf of the employer, corroborated this opinion by testifying as follows:

"A. Well, my feeling is this, my belief is this, that if his heart had been damaged at the time of the accident, he should have showed heart symptoms immediately.

"Q. What are those heart symptoms he should show?

"A. The symptoms would be pain over his heart and disturbances of rhythm.

"Q. Should he be aware of his chest distress as of that time?

"A. If the heart was injured at the time he received the blow in the belly, he should have heart symptoms and heart distress. He was complaining of distress of the abdomen, but not the heart.

"Q. Would you expect such a man who received such an injury to go back and do full time work at the end of three weeks' time?

"A. No.

"Q. Would you expect a man who received an injury to—who received an injury sufficient to cause that kind of damage, to seek medical care and attention for the condition?

"A. Yes, I would. I might add that I would also expect findings. Not only would he have complaints, but the doctor would be able to find disturbance in his heart.

"Q. Would you expect the patient to wait several years before seeking medical care and treatment for the condition?

"A. That in itself is very strong evidence that the condition developed by natural causes rather than being related to trauma."

In stating that the diastasis recti or hernia "could not have been caused by the injury," Dr. Bell explained that the absence of black-and-blue marks, which indicate subcutaneous bleeding, and other external evidences of the injury almost conclusively showed that this particular condition did not result from the accident. Thus he testified as follows:

"Q. What would be the nature of the findings that you would expect to find? What would be the objective signs of the injury?

"A. Well, in addition to the local findings, the patient would be in a state of collapse. The fascia forming the mid-line is very dense and firm. It would take a lot of force to tear it through. That is the only way that trauma could produce diastasis recti, the actual tearing of it. Such severe injury would probably produce shock in the patient.

"Q. Would you expect a patient who had such a herniation to travel in a taxicab to a doctor's office and return home in a cab, Doctor?

"A. No, I would not."

Dr. Rea testifying for the employee, in being cross-examined, tended to support this view as follows:

"Q. To produce a diastasis recti with one blow you'd have to tear the fascia between the recti muscles?

"A. That's right.

"Q. Would you expect that type of blow to leave external marks of violence?

"A. It should, yes."

 Findings of fact by the Industrial Commission should not be disturbed unless a review of the evidence and the permissible inferences drawn therefrom clearly requires reasonable minds to adopt a contrary conclusion.[2] Here there was a conflict in the medical testimony as to whether there was evidence of a sufficient causal connection between the accident and the employee's present heart and hernia conditions. In Gardner v. State Dept. of Highways, 199 Minn. 172, 271 N. W. 597, we had occasion to review a decision of the Industrial Commission in which compensation was denied to a highway employee who suffered from an auricular fibrillation alleged to have been sustained as the result of an accident arising during the course of employment. The heart seizure occurred several months after the accident and, as here, the question arose as to whether the condition was produced by the accident or whether it was an organic condition developed by natural causes unrelated to trauma. There was also a conflict in the medical testimony as to causal connection. It was noted that we are obliged to view the facts in a light most favorable to respondent, and since there was sufficient evidence to substantiate the decision, the Industrial Commission was affirmed.

In Caputa v. Land O' Lakes Creameries, Inc. 234 Minn. 514, 48 N. W. (2d) 895, we had occasion to review an order of the Industrial Commission denying compensation to an employee who suffered from hernia. There, as here, the sole issue was whether there was evidence to support the finding, and we said (234 Minn. 517, 48 N. W. [2d] 896):

---

[2]Casey v. Northern States Power Co. 247 Minn. 295, 77 N. W. (2d) 67; Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118; Jones v. Excelsior Laundry Co. 183 Minn. 531, 237 N. W. 419; Westereng v. City of Morris, 205 Minn. 219, 285 N. W. 717; 6 Dunnell, Dig. & Supp. § 10426.

"* * * where the evidence of causal connection of the hernia and the alleged accident is in conflict, the conclusion of the industrial commission based on competent evidence must be sustained."[3]

In general, where there is a conflict in medical testimony, the determination of the question of causal relationship is ordinarily for the Industrial Commission.[4] In this case the decision of the commission affirming the determination of the referee is adequately supported by the record.

Because the case is disposed of upon the grounds stated above, there is no need to discuss employee's petition seeking to take additional evidence on the question of whether he is now totally and permanently disabled.

Affirmed.

---

[3]Also, see, Schwendig v. Anderson & Hedwall Co. 207 Minn. 14, 289 N. W. 772; Taddi v. Village of Hibbing, 186 Minn. 218, 242 N. W. 717; Brajan v. Oliver I. Min. Co. 181 Minn. 296, 232 N. W. 342.

[4]Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636; Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118; Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 8 N. W. (2d) 24.