## HELEN C. FULLER v. PACIFIC INTERMOUNTAIN EXPRESS COMPANY AND ANOTHER.

136 N. W. (2d) 307.

July 2, 1965—No. 39,456.

*Hansen & Hazen* and *Gene P. Bradt,* for relators.

*Robins, Davis & Lyons* and *Arnold M. Bellis,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Certiorari to review a decision of the Industrial Commission,

wherein it awarded compensation to Stanley R. Fuller,[1] former employee of relator Pacific Intermountain Express Company for 62 weeks' total disability between April 4, 1960, and June 9, 1961, and 2/5 week's total disability suffered before that time; for 100-percent permanent partial disability by reason of the amputation of employee's left leg on January 2, 1961, because of fibrosarcoma in the medial femoral condyle near the kneecap; and for medical, surgical, and hospital expenses incurred by the employee in efforts to cure and relieve the disability described.

The commission found that the disability described was the result of an industrial accident sustained by the employee on August 6, 1959, in the course of his employment. It is the contention of relators, employer and its insurer, that the evidence is insufficient to sustain this finding.

The evidence reveals that the employee was employed in loading and unloading employer's cargo trucks and trailers; that in this work he used his knees to assist in bearing the weight of heavy wooden crates handled by him; that he had worked continuously for employer from May 18, 1959, and had been in good health until the accident of August 6, 1959; that on that day, while lifting a wooden crate weighing approximately 150 pounds onto one of relator's trailers, he fell in such a way that his left knee twisted and the crate fell, striking him on the inside of his left kneecap; that he immediately felt severe pain in the area of the impact but finished his work for that day; that that night his left knee commenced to swell and pain; that on the following day he was admitted to Swedish Hospital and was examined there by Dr. Kenath Sponsel on August 8; and that the admitting history of the employee at Swedish Hospital, which was signed by Dr. Sponsel, disclosed the following:

"* * * pain in his left knee. Last day at noon when he was going

---

[1]Helen C. Fuller, widow of Stanley R. Fuller, deceased employee, on behalf of herself and dependent daughter, Marlene M. Fuller, was substituted as petitioner herein following employee's death on August 18, 1962.

to load freight a box fell down and hurt his knee. He felt an acute pain and couldn't walk, and couldn't bend his knee at all. * * *

* * * * *

"* * * left knee very painful in front area and internal region of knee, a little swelled and pressing on rotule bone is very painful and showed liquid into articulation. Impression: hemarthrosis of left knee by trauma."

The evidence further established that on August 10, 1959, the employee returned to work but that from that date on he continued to suffer pain in his left knee; that for a short time his leg became discolored—taking on a dark bluish-red color in an area extending 4 inches above and 4 inches below the medial side of the knee; that from August 6, 1959, its condition was such that it compelled the employee to walk with a limp; that thereafter he suffered continuous pain in his knee and was required to have medical treatment for it at intervals; that on October 27, 1959, he returned to Dr. Sponsel complaining of pain in this same knee, which by then had remained swollen for some time; and that between October 28, 1959, and March 31, 1960, pursuant to the advice of Dr. Sponsel, he received physical therapy and X-ray treatment for this knee.

The evidence further disclosed that on March 3, 1960, while loading a trailer of his employer, the employee sustained a second injury when a truck driver suddenly drove off, causing him to fall to the frozen ground on his knees and back and injuring his right arm; that following this accident, he again felt sharp pains in his left knee and was unable to return to work the following day; that on April 3, 1960, he returned to Swedish Hospital and on April 4 Dr. Sponsel performed exploratory surgery upon his left knee which revealed increased vascularity in this area of the injury; that X rays taken May 27, 1960, indicated definite abnormality in the medial femoral condyle; and that later X rays of the employee's left knee, taken on August 3, 1960, showed an additional loss of calcium in this bone structure.

The records of Swedish Hospital further disclosed that when the

employee was hospitalized on April 3, 1960, his history was compiled as follows:

"This patient * * * admitted in this hospital tonight with the complaints of pain and swelling of left leg since last August when he received an injury on the inside of the left leg while he was lifting something and hit it against. Followed by sharp pain and swelling. With this injury he was brought to this hospital and stayed for one day. Since then he used to be complaining of pain and swelling during his working and night associated with limping gait and muscle atrophy of left leg. With this leg suffering he received physical therapy and X-Ray treatment, but without any remarkable improvement. In spite of this trouble he kept to work and complained of same trouble at left knee region. * * *

* * * * *

"Extremities: left knee; swelling at inner aspect of knee joint but no knee bloating noted. * * * Palpated tenderness at medial aspect of left knee joint. * * * Right knee normal."

On December 27, 1960, X rays taken at the Mayo Clinic disclosed further deterioration of the medial femoral condyle of the left leg and the biopsy report at that time disclosed that he was suffering from a fibrosarcoma, a malignant tumor on the interior of the condyle and extending outward, which would require amputation of his left leg above the knee. This amputation was performed by Dr. J. C. Ivins of the Mayo Clinic on January 3, 1961.

The medical testimony on which the findings of the commission were in part based may be summarized as follows: Dr. Sponsel, an orthopedic surgeon, testified that when he first examined the employee he observed a bruise on the front and to the medial side of his left knee and discoloration in the area; that he found no abrasion of the skin; that a bruise in the area of the kneecap will cause the knee to swell and that because of tenderness on the medial side of employee's kneecap it was his impression that this was where the blow was sustained by the employee; that his first diagnosis was that of a contusion of the knee with effusion into the pre-patella bursa;

that X rays taken on August 7, 1959, did not disclose any injury to the bone or any other deterioration therein; that when he observed and examined the employee on October 27, 1959, he noted minimal swelling of the knee in the area where the kneecap and femur join; that on April 4, 1960, when the exploratory surgery was performed on the employee's left knee, he noted an increased vascularity there, but found the bone solid; and that X rays taken at the Mayo Clinic on December 27, 1960, showed deterioration of the bone in this area with indications of a tumor. He was unable to state whether such a tumor was causally related to the injury sustained by the employee. He was unable to express an opinion as to whether the increased vascularity found in employee's left knee during exploratory surgery of April 4, 1960, was related to an underlying bone tumor.

Dr. Ivins, who performed the amputation of employee's leg, testified that the fibrosarcoma with which employee was afflicted had its origin in the fibrous tissue on the interior of the medial femoral condyle extending outward into the hard part of the bone; that the wall of this bone is normally only 3 to 4 millimeters in thickness; that in his opinion there was no causal relationship between the injuries sustained by the employee and the fibrosarcoma which required amputation of his leg—the basic reason for his position being his opinion that trauma can never be the cause of this type of sarcoma.

Dr. Moses Barron testified that employee's fibrosarcoma had originated outside the femoral condyle and not in its interior; that the X rays of August 7, 1959, showed no abnormal bone pathology or deterioration and that this, in his opinion, negatived the presence of a tumor prior to the injury sustained on August 6, 1959; that had these X rays shown bone deterioration, it then would be his opinion that there was no causal relationship between the injury and the subsequent fibrosarcoma; that in the absence of evidence of such bone deterioration at that time and because of other factors revealed in the records of Swedish Hospital, the records of the Mayo Clinic, his review of the X rays and of the examinations made by Dr. Sponsel

and the Mayo Clinic, as well as the fact that the origin of the malignant growth was in the immediate area where the employee had sustained his injury, it was his opinion that there was a direct causal relationship between this injury and the subsequent gradual development of the fibrosarcoma which later manifested itself and on account of which the amputation was performed.

Based upon the foregoing evidence, in its opinion the commission stated:

"We believe the record gives ample indication that on August 6, 1959, the employe sustained the injury that he testified to. * * *

"The employe's medical history shows a continuity of pain and difficulty in the area of injury, which was the same area the cancer was found. X-rays right after the injury on August 7, 1959 revealed no cancer. X-rays taken the latter part of 1960 did. The area of bone was hard in 1959, and in the latter part of 1960 was soft. To the usual question of what caused the cancer, the usual controversial medical answers and reasons were given. Briefly summarized, the argument of insurer's expert is that the tumor originated on the inside of the bone and progressed independently of trauma. The plaintiff's expert's opinion was that the blow created a change in the makeup of the cells, which resulted in cancer.

"Similar controversial medical theories of cancer were expressed in such leading cases as Austin v. Red Wing Sewer Pipe Co., 163 Minn. 397, 204 N. W. 323, 3 Minn. W. C. D. 136; Hertz v. Watab Paper Co., 184 Minn. 1, 237 N. W. 610, 6 Minn. W. C. D. 393; Pittman v. Pillsbury Flour Mills, 234 Minn. 517, 48 N. W. (2d) 735, 16 Minn. W. C. D. 287; and Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118, 17 Minn. W. C. D. 163.

"Both experts in the instant case were impressive. The critically important legal-medical elements of cancer, were not taken out of the field of controversy by the learned answers of either. Nor can we do so."

As we have frequently stated, where a fact issue arises with respect to the causal relationship between an industrial injury sustained by an employee and his subsequent disability, this court will sustain the

findings of the commission on this issue where there is credible evidence to support it. Caputa v. Land O' Lakes Creameries, Inc. 234 Minn. 514, 48 N. W. (2d) 895; Schmoll v. J. W. Craig Co. 228 Minn. 429, 37 N. W. (2d) 539; Liakos v. Yellow Taxi Co. 225 Minn. 34, 29 N. W. (2d) 481; Kundiger v. Waldorf Paper Products Co. 218 Minn. 168, 15 N. W. (2d) 486. Likewise, where there is a conflict in credible medical testimony with respect to this issue, this court must rely on the determination of the commission, for it is the commission which must determine questions of credibility where conflicting medical evidence is submitted. Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118; Pittman v. Pillsbury Flour Mills, Inc. 234 Minn. 517, 48 N. W. (2d) 735; Hertz v. Watab Paper Co. 184 Minn. 1, 237 N. W. 610. Here, where the medical evidence is in dispute, we cannot say that the commission erred in adopting the opinion of Dr. Barron that there was a causal relationship between the employee's injury and the subsequent fibrosarcoma. While it is true that the testimony of Dr. Ivins was impressive in support of his opinion that trauma bears no relationship to fibrosarcoma of this kind, nevertheless there was persuasive evidence to the contrary. When the latter is considered together with all other factors in this case, particularly the history of the injury and its close relationship to the fibrosarcoma which followed it, we have no choice but to affirm the commission's finding that there was a causal relationship between the injury and the disability.

Respondent is allowed $250 attorneys' fees in this court.

Affirmed.