# ETHEL B. PAGETT, SPECIAL ADMINISTRATRIX OF ESTATE OF HOWARD H. PAGETT, v. NORTHERN ELECTRIC SUPPLY COMPANY.

167 N. W. (2d) 58.

April 18, 1969—No. 40939.

*Hammer, Weyl, Halverson & Watters,* for appellant.

*Courtney, Courtney & Gruesen* and *Thomas W. Gruesen,* for respondent.

Heard before Knutson, C. J., and Nelson, Sheran, Peterson, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendant's motion for judgment notwithstanding the verdict or for a new trial.

About 6:30 p. m. on July 20, 1964, plaintiff, Howard H. Pagett, was walking in an easterly direction on the north side of Michigan Street in the city of Duluth. He was returning to his car, which was parked next to the curb directly behind the building of defendant corporation, Northern Electric Supply Company. Just before plaintiff got to his car he stepped on a coalhole cover. The cover flipped up, plaintiff's right leg dropped into the hole up to his hip joint, and his left leg "spread-eagled" on the adjacent sidewalk. With the aid of an unknown passer-by, plaintiff got out of the coalhole, replaced the cover, entered his automobile, and returned to his place of employment. From there he called the president of Northern Electric, Robert Gurovitsch, and informed him of his fall. Plaintiff then went home and got his wife and together they drove to the emergency room of St. Luke's Hospital in Duluth, where plaintiff was X-rayed and received emergency treatment, after which they returned to their home.

Police Officer Harold F. Abrams received a radio call the same evening informing him of the accident. He proceeded to the scene of the accident about 7:30 p. m. and examined the coalhole. He testified that when he "stepped on the cover, the whole thing would move down and it would move with your weight on it and the cover would come off at the same time."

By stipulation it was established that defendant corporation occupied two buildings extending from Superior Street to Michigan Street; that one of these buildings had been the city hall and the other building had been the city jail; that the city of Duluth had acquired the lots in 1889 and built the two buildings; and that the city owned these buildings and lots until February 25, 1946, when it deeded the property to the LaSalle Apartment Company. The city had built and made use of the coalhole involved here during its ownership of the buildings.

Mr. Gurovitsch testified that Northern Electric had occupied the city hall building since 1945; that in 1948 they had also moved into part of the old city jail building. He said that no use was made of the coalhole and underlying vault by anyone from 1945 to the time of the trial and that neither he nor any of his employees had ever been in the vault, so far as he knew, up to the time of trial; nor did he know whether any of his employees had ever lifted the cover and looked into the hole. Mr Gurovitsch did examine the cover the morning after the accident and testified that when he stepped on it, it did not rock or move.

Plaintiff was 64 when the accident occurred. He said that he started as a "parts man" in the automobile business in 1928 but had been in the sales end of the business since about 1933; that he normally worked 6 days a week, from 8 a. m. to 6 p. m., making outside calls as well as handling showroom sales; that he did not return to work for 3 days after the accident; and that it was about 6 months before he was able to work a full day.

Plaintiff testified that after the accident he had pain in his lower back, left hip, and the upper part of his left leg, which continued to the time of trial in January 1967. About 6 months after the accident he started using a cane. He testified that at all times from July 1964 to January 1967 he had difficulty standing and sitting for prolonged periods, and

that he could not "make [his left leg] always go where I want it to," as it got tired. He said he could not get around to make his calls after the accident, and during the day he hardly left the building where he worked. In September 1966 he dislocated his left elbow in a fall in his house, which he claimed was caused when he "got tangled up with the left leg." Plaintiff's medical expenses totaled $611.20 up to the time of trial, excluding the bills of Dr. John C. Feuling, orthopedist, and Dr. Gordon J. Strewler, neurosurgeon.

Dr. Feuling testified that he first saw plaintiff on June 22, 1965, at which time he obtained a history of his injury. An examination had disclosed muscle tightness in plaintiff's back and pain in his left leg when, lying on his back, he tried to raise his leg to a right angle, which indicated to the doctor some type of nerve irritation in the low back region. He found nothing wrong with the right leg. Inasmuch as the left leg showed increasing weakness in a subsequent examination, Dr. Feuling referred plaintiff to Dr. Strewler because of the possibility of a tumor. Dr. Feuling again examined plaintiff on January 24, 1967, 2 days before trial. He indicated that plaintiff would have difficulty in walking and would probably have to use a cane to support his left leg. He testified that plaintiff had a 20-percent permanent disability of the left leg, and that he did not observe any other conditions or disease that might contribute to plaintiff's condition. Defense counsel did not cross-examine Dr. Feuling.

Dr. Strewler first examined plaintiff in July 1965. He obtained a history of the accident and hospitalized plaintiff in St. Luke's Hospital from July 8 to 10, 1965, for a physical neurological examination. The doctor testified that during the time he treated plaintiff, his left leg had its "ups and downs" with variations in temperature, spasticity, color, and ability to walk. He discharged plaintiff in June 1966 because he felt he could not offer him any further service that would improve the condition of his leg.

Dr. Strewler testified that plaintiff did have several conditions that were foreign to the accident. He thought plaintiff's hypertension was not related to the accident. He also stated that while the impairment of circulation in plaintiff's left leg could be related, through aggravation, with

his fall, it was not caused per se by the fall. He further indicated that plaintiff's condition in June 1966 would limit him to certain types of employment. Finally, he testified that plaintiff had a 20- to 25-percent permanent disability of the left leg.[1]

The case was tried before a jury, which returned a verdict for plaintiff in the sum of $15,000.

Defendant raises several issues on this appeal. The pertinent ones are: (1) Where a municipality constructed a vault, equipped with a manhole, under a public sidewalk adjacent to a public building and ceased to use the vault and manhole during the period of its ownership, does the subsequent owner, which claims to have made no use of the device, have a duty to maintain the manhole as respects the safety of a pedestrian traveling along the sidewalk? (2) Did the evidence adequately establish a causal connection between plaintiff's accident and his disability; and, if so, did it justify a $15,000 verdict in favor of plaintiff?

■ Defendant argues that the duty of keeping a public sidewalk in a condition reasonably safe for travel rests with the municipality and not with the abutting owner or occupants, citing Sand v. City of Little Falls, 237 Minn. 233, 55 N. W. (2d) 49, and cases referred to therein. The legal issue we considered in Sand was whether the owners of property abutting on a public sidewalk were responsible for a defect in the walk not created by them but which resulted from the roots of a tree located on their premises adjacent to the sidewalk. The trial court directed a verdict against the city and the abutting owner. We reversed as to the owner, stating that under the circumstances there it was the duty of the city to keep the walk in a reasonably safe condition.

Defendant also recognizes the rule set out in Callahan v. City of Virginia, 230 Minn. 55, 58, 40 N. W. (2d) 841, 842, in which this court held that both a municipality maintaining public walks and the owner of

---

[1] Plaintiff died February 14, 1968, in St. Luke's Hospital. The final diagnosis was (1) essential hypertension, (2) hypertensive cardiovascular disease with coronary sclerosis, (3) vascular degenerative disease of the brain stem producing a pseudobulbar palsy, and (4) fatal pulmonary embolus. Plaintiff's wife, Ethel E. Pagett, was appointed special administratrix and was substituted as plaintiff-respondent.

property adjoining them are liable for injuries sustained by reason of defective entryways, coalholes, or other facilities placed therein for the convenience of the building owner, where such defects are due to the owner's negligence. The owner is liable because of his creation of the dangerous condition, and the municipality is liable because of its neglect to use due care to keep the public walks in a reasonably safe condition. It is defendant's position here that although the trial court held that defendant was liable for any defective condition of the coalhole and underlying vault, it did not create the condition, did not use the facility or receive any benefits from it, and therefore acquired no obligation for its maintenance.

Defendant further contends that the city had exclusive responsibility for the public sidewalk and its underlying structure during the time the city owned the building and that the city had a dual liability, first, as an adjoining property owner which constructed the coalhole, and second, as the municipality having the obligation to maintain the public sidewalk in proper condition. It argues that if the city had intended to impose on defendant any duty with respect to the sidewalk vault, it would have done so pursuant to the building code affecting sidewalk vaults; [2] and that it is clear from the evidence that no such condition was imposed either by the deed of conveyance or by any ancillary agreement.

It appears from the record that at the trial it was plaintiff's position that the coalhole constituted an island in the public sidewalk and that defendant was responsible for its maintenance. Defendant claimed it was the city's duty to maintain the coalhole because it was located in the public sidewalk. It was the trial court's opinion, in view of City of Wabasha v. Southworth, 54 Minn. 79, 55 N. W. 818, and later cases, that this responsibility was placed on the owner of the abutting premises and that use of the coalhole is immaterial as defendant cannot relieve himself

---

[2] Duluth Building Code, § 4510, provides: "The space below the sidewalk level in any public property may be used for any purpose not inconsistent with any other requirements of this or other Ordinances under the conditions specified in Sections 4511 to 4516 inclusive; provided, however, that permission for such use be first obtained from the City Council through the Department of Building Inspection."

from responsibility by abandoning the hole, citing Bonniwell v. St. Paul Union Stockyards Co. 271 Minn. 233, 135 N. W. (2d) 499.

Plaintiff argues that a property owner who knows of the existence and character of a coalhole in a sidewalk behind his building, which coalhole gives access to a vault formerly used to service his building, has a duty to inspect and maintain it in safe condition and that failure to do so constitutes negligence. He contends that the evidence here clearly establishes the location of the coalhole as one giving access to the coal vault below the sidewalk behind defendant's building, to which vault there was direct access through defendant's basement; and that it was this coalhole into which plaintiff fell when its cover flipped as he stepped on it. Plaintiff further contends that, these factors having been established, the remaining question concerns defendant's responsibility to plaintiff. He cites, among other cases, City of Wabasha v. Southworth, *supra*. Southworth had purchased a building which had a wooden trapdoor built into the plank sidewalk in front of it for access to the cellar. At the time of the purchase, the trapdoor was nailed down and was not used again. The building was subsequently unused for a considerable period of time. In 1889 it was rented by Southworth to another party. In 1891 an individual walking along the sidewalk fell through the trapdoor and was injured. The city of Wabasha settled with the injured party and brought action against Southworth to recover what it had paid. The city prevailed in the trial court and on appeal to this court. In an opinion written by Mr. Justice Mitchell, this court held that where a cellarway, trapdoor, scuttle, or the like is put into a public sidewalk for the convenience of the abutting property, the duty of maintaining it in a safe condition, as between the owner and the city, devolves upon the owner, and he cannot release himself of this duty by merely abandoning the use of the structure—he can only do so by removing it and restoring the sidewalk to its original condition. This court further held that if, through the negligence of the property owner, the structure becomes unsafe and injury results, for which the city is liable because of neglect of its duty to keep its streets in a safe condition for travel, the city could, upon payment of damages to the injured person, recover from the owner by whose fault, as between him and the city, the injury was occasioned.

It is our opinion that Southworth is strikingly similar to the case now before us. In both cases the defendant was not the original owner of the property; someone other than the defendant caused the offending structure to be located in the public sidewalk; neither defendant used the structure after he assumed total ownership of the property; and both defendants failed to inspect, repair, or maintain the structure. The principles set out in Southworth were reaffirmed more recently in Sternitzke v. Donahue's Jewelers, 249 Minn. 514, 83 N. W. (2d) 96, and Bonniwell v. St. Paul Union Stockyards Co. *supra.*

While the fact situation in Bonniwell was not the same as here, the principle stated there is similar. The plaintiff there sued for damages incurred when he fell part way into a manhole at the St. Paul stockyards. The manhole was in an alley near a scale house in which Bonniwell had been working. Because of the location of the manhole, it was necessary that while performing his job Bonniwell pass very near or over it. After picking up weight tickets at the scale house, he was returning to his employer's office when he stepped on the lid of the manhole and it tipped, allowing him to fall. We held there that where a manhole cover in an area under the exclusive control of the defendant tips and causes injury to a business invitee, liability is properly determined by applying the general rule that a possessor of the premises, while not an insurer of the safety of business invitees, is bound to exercise reasonable care to construct and maintain his premises in a reasonably safe condition for their use; that the duty is continuing in nature and does not end with an original safe construction or installation but continues as long as the premises are devoted to such use; and that reasonable inspection during such use is a duty incident to the maintenance of the premises.

Plaintiff's exhibits A, B, C, and E, which were photographs of the coalhole taken the day after the accident, establish that the mortar or concrete holding the coalhole in place had deteriorated. The testimony of Officer Abrams, who examined the coalhole about an hour after the accident, also established that the mortar that held the frame for the cover of the coalhole was crumbled and loose and that the whole construction, including the rim and cover, moved when stepped on. Officer Abrams also testified that when he stepped on the cover it would tip in.

Robert Gurovitsch, defendant's president, testified that he knew there was a vault under the sidewalk, but that he and his employees had never inspected either the vault or the coalhole cover.

It is our opinion that the evidence here is sufficient to justify a jury verdict that defendant negligently permitted the coalhole to become sufficiently defective to be unsafe for travel, which resulted in injuries to plaintiff.

Viewing the evidence in the light most favorable to plaintiff, we believe that plaintiff sufficiently sustained his burden of proof as to liability.

■ Defendant contends (a) that plaintiff did not properly sustain his burden of proof as to injuries and damages sustained from the time of the accident to the time of trial (July 1964 to January 1967); (b) that the trial court incorrectly submitted the issue of future pain, disability, and loss of earning capacity; and (c) that the verdict was not justified by the evidence and was excessive.

It is neither necessary nor proper that we go into a lengthy or detailed discussion of the evidence here for the purpose of justifying the findings of the trial court. Maust v. Maust, 222 Minn. 135, 23 N. W. (2d) 537. Our duty is performed when we have fairly considered all of the evidence and from it have determined that it reasonably supports the findings. Meiners v. Kennedy, 221 Minn. 6, 20 N. W. (2d) 539. Plaintiff was required to prove his damages only by a fair preponderance of the evidence. Carpenter v. Nelson, 257 Minn. 424, 101 N. W. (2d) 918.

The evidence is undisputed that plaintiff stepped into the coalhole, did a so-called "spread-eagle," and received emergency treatment at a hospital; sustained abrasions of the legs; had accompanying pain in the lower back, left hip, and upper part of the left leg, with other obvious injuries and discomforts; and sustained loss of earnings. Defendant argues, however, that no physician expressed an opinion as to the causal relationship between the accident and the various complaints.

In cases where causal connection must be established *solely* by expert testimony, the medical expert must upon an adequate factual foundation testify not only that in his professional opinion the injury in question *might* have caused or contributed to the subsequent disability of the in-

jured person, but that such injury *did* cause or contribute to his condition. Saaf v. Duluth Police Pension Relief Assn. 240 Minn. 60, 59 N. W. (2d) 883. However, we have said that it should be recognized that inferences, if rational and natural, which follow from a sequence of proved events may be sufficient to establish causal connection without any supporting medical testimony. Daly v. Bergstedt, 267 Minn. 244, 126 N. W. (2d) 242; Annotation, 135 A. L. R. 516.

Here the medical testimony did show a possible causal relationship between the accident and subsequent physical impairment. Dr. Feuling testified:

"Q. During the course of your treatment of your examinations of Mr. Pagett, did you observe any other conditions or other disease he was suffering from that might contribute to his present condition?

"A. No. I found none."

A jury could well have understood from that testimony, after hearing the doctor describe plaintiff's condition when he examined him after the accident, that that condition resulted from the accident—especially when he said he found no other explanation for it. While the question could have been put more directly, we would be naive to say the doctor was not describing plaintiff's condition as resulting from the accident.

Dr. Strewler testified that plaintiff had "conditions other than the conditions that are due to the fall." However, his testimony can also be interpreted as saying that some of plaintiff's condition was due to the fall.

This medical testimony, in conjunction with the other evidence, would in our opinion enable any layman of average intelligence to determine from his own knowledge and experience that the accident was the cause of at least some of plaintiff's injuries and damages. There was testimony that prior to the accident plaintiff was in so-called "excellent" physical condition and had not suffered any previous difficulty with his leg or back. After the accident plaintiff experienced great difficulty and discomfort in walking, and from about December 1964 to the date of trial he used a cane; he had difficulty sleeping; he could do no lifting; and he was unable to stand or sit for any prolonged period of time. The jury

could also observe that plaintiff experienced difficulty walking in the courtroom and had to be assisted on and off the witness stand.

Plaintiff's ability to work, subsequent to the accident, diminished steadily. His income was $4,331.11 in 1964; $2,402.52 in 1965; and $988.11 from January 1 to May 23, 1966.

In Jorstad v. Benefit Assn. of Railway Employees, 196 Minn. 568, 265 N. W. 814, this court said that a verdict for plaintiff will be sustained where circumstantial facts, argued in corroboration of expert medical opinion, so closely and directly connect the trauma with the injury or death as to lead to the reasonable and probable inference that the trauma was the originating and proximate cause of injury or death.

In Daly v. Bergstedt, *supra*, where the plaintiff fell, badly bruised her breast, and developed cancer at the exact spot of the bruise, the court permitted the jury to find that there was a causal connection between the fall and the cancer, even though conflicting medical testimony was given. The court said that where there was not only medical authority but also evidence of a sequence of events, including gradual deterioration between the time of trauma in the accident and development of cancer at the point of trauma, a fact question was presented as to the causal connection.

■ The issue of future pain, disability, and loss of earning power was properly submitted to the jury. Future damages may be recovered only if they are reasonably certain to occur. Carpenter v. Nelson, *supra*. Expert medical testimony is not the exclusive means of proving future damages or permanent injuries. Other evidence may be used, such as showing that plaintiff is not fully recovered at the time of trial. Carpenter v. Nelson, *supra*.

We believe that the verdict of $15,000 is not excessive. Whether a verdict should be set aside as excessive rests largely in the discretion of the trial court, whose determination will not be reversed on appeal unless it clearly appears that such discretion has been abused. Colgan v. Raymond, 275 Minn. 219, 146 N. W. (2d) 530. Considering the evidence that plaintiff's injuries to his left leg were permanent—20 to 25 percent; that his ability to continue working would be considerably restricted or completely eliminated; that his life expectancy was 10 years at the time

of trial; and that he had to be helped on and off the stand and was in obvious pain and discomfort during the course of the trial, it does not appear that the trial court abused its discretion.

We realize that when we heard this case on appeal (January 29, 1969) plaintiff had passed away. However, the jury returned its verdict on January 31, 1967. To remand the case now for a new trial on the issue of damages would create a new situation where the plaintiff could not testify or be observed by the jury. While the damages might now be properly reduced as a result of plaintiff's death since the trial, when his life expectancy was shown to be 10 years, we must recognize that the jury was acting on the evidence before it at the time of the trial in January 1967 rather than as it was at the time the appeal was argued before this court.

Affirmed.