JEROME DALY AND OTHERS, TRUSTEES OF MARIE P.
DALY, v. JOHN H. BERGSTEDT AND ANOTHER, d.b.a.
BERGSTEDT-NIELSEN STORE EQUIPMENT COMPANY, AND
OTHERS.
JAMES DUFFY AND ANOTHER, d.b.a. DUFFY BROTHERS,
RESPONDENTS.

126 N. W. (2d) 242.

January 31, 1964—No. 38,744.

*Thomas J. Battis* and *Murnane, Murnane, Battis & deLambert,* for appellants.

*Solly Robins, Stanley E. Karon,* and *Robins, Davis & Lyons,* for respondents Daly.

*J. H. Geraghty* and *Altman, Geraghty & Mulally,* for respondents Duffy.

MURPHY, JUSTICE.

This appeal follows a verdict recovered by plaintiffs' decedent for personal injuries and is from an order denying a new trial and granting indemnity to two of the codefendants against the others. The action was brought by Marie P. Daly against James and Robert Duffy, doing business as Duffy Brothers, who operated a grocery and general retail merchandise store in the village of Rosemount. Also joined as defendants were John H. Bergstedt and George W. Nielsen, doing business as Bergstedt-Nielsen Store Equipment Company, and Richard Hotch, their employee. At the time the plaintiff's alleged injuries were incurred, the Bergstedt-Nielsen company was engaged in installing new equipment in Duffy Brothers place of business. (Mrs. Daly died after trial and respondents Daly have been substituted for her.)

The first issue raised is whether the record establishes that there was a causal connection between the disease of cancer, from which the plaintiff allegedly suffered, and the accident which occurred on the store premises. The second issue is whether the trial court properly allowed indemnity in favor of Duffy Brothers against the appellants, Bergstedt, Nielsen, and Hotch.

From the record it appears that while shopping at Duffy Brothers store on June 26, 1957, Mrs. Daly fell and was injured. She had patronized the store for a number of years. On the day in question she

completed her shopping and paid for her merchandise. A clerk placed the merchandise in two large grocery bags. He handed them to Mrs. Daly, one in each arm, and she proceeded to walk down the aisle toward the doorway leading to her car. Along the way her left foot struck a pile of masonite molding placed directly across the aisle, causing her to fall to the floor.

Prior to the fall, Richard Hotch had moved a bundle of molding sheets out into the aisle where Mrs. Daly fell. These sheets were dark in color, as was the floor, and 6 inches in height. The store was open for business as usual during remodeling. It does not appear that special arrangements were made between the Duffys and the contractor with reference to the areas of work while the alterations were being made. Robert Duffy testified that he did not see the masonite in the aisle before the accident and that it had been placed there shortly before Mrs. Daly fell. The aisle was clear when Mrs. Daly entered the store. The statements of Hotch as to how long the masonite had been in the aisle prior to the accident are contradictory. He testified that the pile had been there close to an hour and explained why this was correct. However, this testimony was contrary to an earlier statement made the day after the accident. He then said that Mrs. Daly was in the store when he began working with the masonite and that the stack was in the aisle about 5 minutes before the accident. About a week after the accident, he signed a statement in which he said that the masonite had been in the aisle 15 minutes before the fall.

It appears that immediately after the fall plaintiff was dazed. When she completely regained her senses, she found that she was lying on top of cans of staples contained in the bags. She could not move her left leg or left side and was in severe pain. She was taken to her home and from there transferred to the hospital in Farmington. Five days later it was found that her left leg had been fractured below the knee. Two days after the fall, Mrs. Daly noticed a bruise, a black and blue mark, on her left breast. This black and blue mark was noticed by both the nurses at the hospital and a friend. Mrs. Daly remained in the hospital for 3 weeks. During the following autumn, her leg grew stronger, allowing her to resume some of her normal activi-

ties. It appears, however, that recovery from the fracture was slow. During the winter of 1957-1958, she received approximately 20 to 25 physiotherapy treatments to relieve the pain in her leg. Later, both Mrs. Daly and her friend, Mrs. Akin, noticed that the bruise on her left breast was getting yellow. Sometime thereafter, the discoloration completely disappeared. She continued to have a distressed feeling in her left side, especially in her breast. On August 16, 1958, approximately 14 months following the fall, Mrs. Daly found a larg lump on her breast located at the same spot as the bruise. On September 2, 1958, further medical examinations disclosed the presence of cancer and the breast was removed by radical mastectomy the next day. After the operation she no longer suffered the pain and discomfort in the left side which she had experienced since the time of the accident. The record indicates that subsequent to this operation, the disease spread to other parts of her body. X-ray and other medical treatments failed to stop the spread of the cancer. Approximately 4 months prior to the accident she had been examined by Dr. Jane Hodgson. At that time her breasts were normal, no tumors or lumps were found, and aside from having some hypertension and being overweight, the plaintiff was in good physical condition.

The issue of liability of the parties for such injuries as the plaintiff actually sustained by reason of the fall is not before us. It is strenuously contended by appellants, however, that there is no factual basis in the record to establish a causal connection between the injury and the disease of cancer. In reviewing this question it may be noted at the outset that this court has considered the subject of causation of cancer in numerous workmen's compensation cases.[1] Noting the lack of certainty as to the cause of cancer in general, we said in Pittman

[1]See, Gaetz v. City of Melrose, 155 Minn. 330, 193 N. W. 691; Saaf v. Duluth Police Pension Relief Assn. 240 Minn. 60, 59 N. W. (2d) 883; Austin v. Red Wing Sewer Pipe Co. 163 Minn. 397, 204 N. W. 323; Pittman v. Pillsbury Flour Mills, Inc. 234 Minn. 517, 48 N. W. (2d) 735; Halper v. The Golden Rule, 180 Minn. 477, 231 N. W. 195; Storing v. Hotel Radisson Co. 177 Minn. 519, 225 N. W. 652; Hertz v. Watab Paper Co. 180 Minn. 177, 230 N. W. 481; Id. 184 Minn. 1, 237 N. W. 610; Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118.

v. Pillsbury Flour Mills, Inc. 234 Minn. 517, 524, 48 N. W. (2d) 735, 739:

"Although the absence of exact medical knowledge on the cause of cancer makes it impossible to say with absolute certainty whether a particular injury caused or aggravated a particular cancer, we are hardly compelled to say that a finding of cause and effect in a given case is without support in the evidence because such tenuous uncertainty exists."

But in the case before us, appellants point to the circumstance that six physicians testified that there was no causal connection, while but one physician expressed the contrary view. Doctors Jane Hodgson, Logan N. Leven, Davitt A. Felder, Roy Swanson, and Ellery M. James, none of whom examined Mrs. Daly after her fall, were all of the opinion that the trauma in the breast could not cause the cancer. Dr. William W. Heck stated that it has never been satisfactorily proved that there is any causal relation between trauma and cancer. On the other hand, Dr. Moses Barron, who testified for the plaintiff, expressed the opinion that cancer could develop from trauma sustained in the fall. Dr. Barron holds to the so-called Ewing view, which postulates that under some circumstances a single trauma may produce a malignant tumor.[2] Following the criteria announced by this medical authority, Ewing, Neoplastic Diseases (4 ed.), Dr. Barron pointed out that Mrs. Daly's case presented a chronological history in which it was found that at no time during the interval between the fall and the discovery of cancer was there a complete or absolute restitution of the injured tissues of the breast to normalcy. He testified that Mrs. Daly had—

"* * * either noticed the bluish discoloration at the time of the injury and later on she noticed some pain, she couldn't lie on it, and later on she noticed that she'd have distress and discomfort in that breast, until, finally, she had more and more of this discomfort and

[2]Ewing, *The Relation of Trauma to Malignant Tumors*, 40 American Journal of Surgery 30.

she went to see a doctor, when a definite nodule was found, which, at the time of the operation, was a very large tumor.

\* \* \* \* \*

"So that the whole history here, from the time of the injury to the time when this tumor was found, and according to the statements that were made that the tumor was in the region where the trauma occurred, that it is entirely reasonable to assume that this process that had been going on in the breast from the time of the blow up to the time of the cancer was a continuous course in which these cells were multiplying and gradually a year or sixteen months later produced a mass large enough that could be easily palpated and led to the operation which showed that it was a scirrhus carcinoma of the breast.

\* \* \* \* \*

"This is the reason then that I feel, from the history that I heard presented, that it is my opinion that there is a definite causal relationship between the fall and the trauma to the breast to the later development of the cancer which metastasized to the bones."

The point raised by appellants is not new. It arises because of the difference in the medical and legal approach to the question of causation. In the case before us it seems that appellants refuse to recognize that legal determination for responsibility may differ from medical findings as to the cause or source of a disease. In Murray v. Industrial Comm. 87 Ariz. 190, 199, 349 P. (2d) 627, 633, it was said:

"\* \* \* The difference in the medical and legal concept of cause results from the obvious differences in the basic problems and exigencies of the two professions in relation to causation. By reason of his training, the doctor is thinking in terms of a single, precise cause for a particular condition. The law, however, endeavors to reach an inference of reasonable medical certainty, from a given event or sequence of events, and recognizes more than one cause for a particular injurious result."

Here the defendants' experts assert that it cannot be medically established that a single trauma can cause cancer. The thrust of plaintiff's case is that there is not only medical authority to the effect that trauma

may produce cancer but, more importantly, that the record establishes legal cause. This concept takes into consideration the entire chain of events from the time of the accident to the time when cancer developed at the exact point of the trauma, including the fact that the accident occurred to a woman in good health and that she was never healthy thereafter. They argue that the inferences from the proven sequence of events provide a reasonable basis for the jury's verdict.

The question raised by appellants was considered in Golob v. Buckingham Hotel, 244 Minn. 301, 304, 69 N. W. (2d) 636, 639, where it was claimed that a trauma or exertion could not result in thrombosis. We there said:

"* * * It is possible that part of the difficulty in understanding the divergence of views of doctors comes about by virtue of the difference in approach to the question of causation by members of the medical and legal professions. However that may be, until the time comes when medical knowledge has progressed to such a point that experts in the field of medicine can agree, causal relation in determining compensable injury or disease will have to remain in the province of the trier of fact. Where qualified medical witnesses differ as they do here, it ordinarily is not for us on appeal to say that one is so eminently right and the other so clearly wrong that the fact finder was obliged to accept the opinion of one and discard the opinion of the other. The determination of this question is like the determination of any other question of fact, and it must depend to a large extent upon the credibility attached by the trier of facts to the opinion and testimony of the various witnesses who are expressing their opinions."

Moreover, it should be recognized that inferences, if rational and natural, which follow from a sequence of proved events, may be sufficient to establish causal connection without any supporting medical testimony.[3]

We conclude that the record fairly establishes that a question of

---

[3]Horovitz, *Workmen's Compensation: Half Century of Judicial Developments*, 41 Neb. L. Rev. 1, 45; Valente v. Bourne Mills, 77 R. I. 274, 75 A. (2d) 191.

fact as to causation was presented which question was properly submitted to the jury.

Nor do our authorities support the appellants' contention that the verdict here cannot stand because the proof is uncertain and speculative. Much the same objection was presented in Weller v. Northwest Airlines, 239 Minn. 298, 58 N. W. (2d) 739, where the plaintiff's doctor was of the opinion that the "most likely diagnosis" of the plaintiff's disability was multiple sclerosis, the cause of which is equally as inexplicable as the cause of cancer. We there said (239 Minn. 303, 58 N. W. [2d] 742):

"It is well settled that a medical expert's opinion need not be free from doubt or capable of demonstration. It is only necessary that it be in his judgment true. * * * The use of the words 'the most likely diagnosis' does not make the testimony speculative or conjectural but merely indicates the problem of all experts that, although their opinion be based upon tests and methods recognized and prescribed by the medical profession, nevertheless there is always the possibility of error.

\* \* \* \* \*

"* * * Where there is such a difference of opinion and where the opinion of a reputable medical expert is submitted that in plaintiff's case the trauma which resulted from the accident was a precipitating factor in bringing on the condition, the causal relationship between the accident and the disease described becomes one for the jury's determination."

It is next contended by appellants that the trial court erred in granting indemnity in favor of the codefendants Duffy. In reviewing this assignment it should be noted that at the conclusion of the testimony the trial court decided to reserve for itself the question of indemnity and submitted to the jury the following forms of verdict: One in favor of all defendants; one in favor of the plaintiff against appellants; one in favor of plaintiff against Duffy Brothers; and a fourth in favor of the plaintiff against all defendants. There was no objection on the part of counsel to the submission of the case to the jury in this manner. The verdict, of course, was for the plaintiff against all of the

defendants. The trial court then considered issues between appellants and defendants Duffy on cross-claims for indemnity. After hearing arguments, the trial court denied appellants' claim and ordered judgment against them in favor of defendants Duffy for indemnity in the amount the Duffys might be obligated to pay the plaintiff. It appears to be the claim of the appellants that there was evidence of affirmative negligence on the part of defendants Duffy which contributed to the accident. This argument seems to be based upon the claim that the Duffys chose to continue the operation of their business while the remodeling was being done; that they had knowledge "that obstructions in the aisles might occur and that this would be a hazard to their customers"; that they failed to warn Mrs. Daly "that there might be obstructions on the floor"; and that they failed generally to police or supervise the premises while the remodeling was being carried on.

The principles of law by which we must be controlled in considering the issues relating to indemnity have been considered in recent decisions of this court.[4] In Hendrickson v. Minnesota Power & Light Co. 258 Minn. 368, 104 N. W. (2d) 843, we outlined the general classification of situations where indemnity might be allowed. We recognized, however, in Larson v. City of Minneapolis, 262 Minn. 142, 114 N. W. (2d) 68, that indemnity is essentially an equitable doctrine which does not lend itself to hard-and-fast rules and its application may vary depending upon the particular facts in each case. We think that the principle stated in Fidelity & Cas. Co. v. Northwestern Tel. Exch. Co. 140 Minn. 229, 231, 167 N. W. 800, 801, is particularly appropriate here. There we said:

"Generally, one of two joint tort-feasors cannot have contribution from the other. But there are exceptions to this rule. One exception arises where although both parties are at fault and both liable to the person injured, yet they are not in pari delicto as to each other, as where the injury results from a violation by one of a duty which he owes to the other, so that, as between themselves, the act or omis-

---

[4]See, Hanson v. Bailey, 249 Minn. 495, 83 N. W. (2d) 252; Hendrickson v. Minnesota Power & Light Co. 258 Minn. 368, 104 N. W. (2d) 843; and Larson v. City of Minneapolis, 262 Minn. 142, 114 N. W. (2d) 68.

sion of the one from whom indemnity is sought is the primary cause of the injury."

See, also, City of Wabasha v. Southworth, 54 Minn. 79, 55 N. W. 818; Olson v. Schultz, 67 Minn. 494, 70 N. W. 779, 36 L. R. A. 790; Dehn v. S. Brand Coal & Oil Co. 241 Minn. 237, 63 N. W. (2d) 6; Minneapolis Mill Co. v. Wheeler, 31 Minn. 121, 16 N. W. 698; Chicago G. W. Ry. Co. v. Casura (8 Cir.) 234 F. (2d) 441; Kahler v. Liberty Mutual Ins. Co. (8 Cir.) 204 F. (2d) 804; and Waylander-Peterson Co. v. G. N. Ry. Co. (8 Cir.) 201 F. (2d) 408, 37 A. L. R. (2d) 1399.

In this case the trial court was persuaded that the negligence of the defendant Hotch was the sole proximate cause of the accident. The record indicates the following observation of the trial court:

"* * * There was no evidence that defendants Duffy had actual knowledge of the aisle obstruction. * * * the principal testimony that might tend to a showing of non-vicarious, 'supervening' liability on behalf of defendants Duffy is that of Hotch, wherein he stated that the aisle impediment was in place for an hour or more before the fall. This was effectively and conclusively impeached.

* * * * *

"* * * the liability of defendants Duffys toward plaintiff, being vicarious and 'non-active,' requires their indemnification from the group of defendants whose negligence towards plaintiff proximately caused her injuries."

We agree that the trial court was correct in its application of the law to the facts in this case. It is true that the Duffys had a nondelegable duty to the public to keep their place of business in a reasonably safe condition and free from danger of personal injury, and that the fact that an independent contractor was engaged in the performance of work upon the premises would not relieve them of that duty. Corrigan v. Elsinger, 81 Minn. 42, 83 N. W. 492. But it must also be kept in mind that in hiring the Bergstedt-Nielsen firm, which was experienced and had special competence in the work to be performed, they had a right to assume that the contractor would so per-

form his work as not to create a condition which would expose them to liability for injuries to their customers. It appears from the record that the nature of the alterations which were being made would not require that in the interest of safety to the public the premises be closed for business. The testimony of defendant Hotch is that it was standard practice during installations of this type to keep the stores open. In any event, keeping the store open during alterations would certainly have involved no unreasonable hazard if the contractor had kept clear the aisles which were in use by customers.

It is true that each group of defendants carried on their separate activities on the same premises at the time of the accident, and it is also true that they worked independently. In addition to the duties they owed the public, they owed to each other the duty not to create a hazard which would expose the other to liability. From the record it appears that customers using the premises were not exposed to injuries in the particular area where the contractor was working because the aisle in that area had been in effect closed off. Defendant Hotch placed the offending pile of masonite, not in the area where he was working, but in an area used by the customers of the store. We cannot agree that this condition existed by reason of any act or omission of the Duffys. Certainly they were not obligated to supervise and police the activities of the contractor and its employees continually. The obstacle was placed in the aisle by the act of the contractor's employee. In causing the bundle of masonite to extend into the aisle, the contractor and its employee independently created the hazard which actually resulted in the accident.

The issue presented here is somewhat similar to that discussed in Brown v. Otis Elev. Co. 91 N. Y. S. (2d) 349, where a customer in a store was injured by the negligent act of an elevator company employee in striking her with an escalator step which he was carrying during the installation of an escalator on the premises under a contract with the store. It was there held that while the store was liable, it was nevertheless entitled to judgment over and against the contractor for the amount of damages assessed by the jury. The court said (91 N. Y. S. [2d] 350) that the act occurred "solely because of the

affirmative negligent acts of the defendant [contractor] and the defendant [store] being at most guilty of passive negligence, it follows that there should be judgment over." We think that reasoning applies with equal force to the facts in this case.

It was contended on oral argument that the issue of indemnity actually turned upon a fact question, which should have been submitted to the jury for determination by special verdict. We agree with the able argument presented that there may be indemnity cases in which there is room for a reasonable difference of opinion concerning the apparent culpability of joint tortfeasors so as to present a fact question for the jury of liability over of one tortfeasor against another. It appears from the record here, however, that there was no objection to the manner in which the issues were disposed of by the trial court, and in any event, we find nothing in the record which would lead us to conclude that the trial court erred in determining the issue of indemnity.

We are of the view that the other points raised by defendants do not require discussion.

Affirmed.