WILLIAM TWEEDY, JR., Plaintiff-Appellee, *v.* WRIGHT FORD SALES, INC., *et al.*, Defendants.—(FORD MOTOR COMPANY, Defendant-Appellant.)

(No. 12466;

Fourth District—August 21, 1975.

Hutton, Hegeler & Buchanan, of Danville, for appellant.

Sebat, Swanson, Banks, Lessen & Garman, of Danville (Ralph J. Swanson, of counsel), for appellee.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The plaintiff sued the retailer, Wright Ford Sales, Inc. (Wright) and the manufacturer, Ford Motor Company (Ford), for injuries sustained when a 1966 Ford Galaxie 500 LTD hardtop allegedly suffered a brake malfunction, resulting in serious injuries to the plaintiff. This products liability case was tried before a jury and judgment was entered upon a verdict for $40,000 damages against Ford. A not guilty verdict was returned as to the claim against Wright. Ford appeals.

Although no pleading issue is presented, it is necessary that the pleadings be briefly reviewed in order to consider some issues in this case. Count I of the complaint alleged that the auto as designed, manufactured and sold by Ford was defective and unreasonably dangerous because its braking system was unable at all times to bring the car to a stop. This count also alleged that this condition existed at the time of manufacture and that the unreasonably dangerous condition was the proximate cause of plaintiff's injuries.

A paragraph of this count initially alleged that plaintiff was in the exercise of due care for his own safety. At the conclusion of all the evidence, plaintiff was permitted to delete this paragraph.

Count II alleged negligence of the defendants. This count was eliminated from the case upon motion for directed verdict at the close of plaintiff's case.

The auto was manufactured by Ford in 1965. The car was tested to ascertain that all parts were functional. The brakes were included in the test. In September of 1965, the car was delivered to Wright. Upon receipt, Wright inspected the auto. This inspection included a check to see that there was fluid in the master brake cylinder, and the car was driven to see that the brakes worked. Wright did nothing to the brakes other than the above.

In December of 1965, Wright sold the car to Russell Beasley. This purchaser drove the car for about 1 month. During that month, nothing was done to the brakes. The car threw a rod and was returned to Wright. The car was repaired, although again the evidence is uncontroverted that nothing was done to the brake system. Upon completion of this repair, the car was sold by Wright to Robert Davis. This was in March of 1966, and the car then had some 500 miles on it.

The car was usually driven only by Robert Davis or his wife Ann Davis. Plaintiff was the only other driver, and he had driven the car only on one occasion prior to the date of his injury.

On May 16, 1966, Ann Davis, plaintiff's daughter, drove the car from Georgetown to near Hoopeston. At a stop sign the brakes did not function, although the pedal did not go all the way to the floor. She immediately tried again and the brakes functioned properly. She said nothing to plaintiff regarding the incident.

Plaintiff took the car to do an errand for his daughter. He drove the car on the errand without any brake difficulty until, on the way home at a "T" intersection, the brakes did not work; the emergency brake also did not function. The plaintiff was unable to negotiate a turn because of obstructions and was unable to stop the car which was then traveling at about 35 mph. The car hit a tree and plaintiff was severely injured. There were no witnesses to the occurrence other than plaintiff. The road was dry; the weather was clear and sunny. The car had been driven some 7500 miles at the time of the accident. Plaintiff had lived in the area for over 20 years and had driven the route many times.

Following the accident, an ambulance was called. In response to the driver's question as to what happened, plaintiff replied "no brakes." Plaintiff in his statement to the treating physician stated, "the brakes went bad and he hit a tree."

No issue is raised upon this appeal regarding the amount of damages.

Following the accident, the car was taken to a Ford garage in Hoopeston. It was examined there by Robert Davis the day after the accident. He found the emergency "brake was jammed all the way into the carpet, and the steering wheel was broke, the dash was crushed in, and the floor was shoved up to the bottom of the power brake." The car remained in Hoopeston for an unstated period of time. It was then removed to Smith's Auto Parts in Danville where it remained for some 3 months, then it was removed to Westville. In October, a David Smith examined the car in Westville. The front fenders, grill, radiator, motor and transmission were missing. The tires, wheels and rear fenders had also been removed.

John Andrews testified as an expert witness for the plaintiff. In the

course of his testimony, he described the functioning of a single master brake cylinder system as used on the Ford automobile here involved and testified that in 1966, two other makes of automobile used a dual master brake cylinder system. He described such a system and his testimony was to the effect that a defect or leak in a dual system only disables one-half of the brake system, leaving a residual braking function. In contrast, a single system, if defective, or in the event of a fluid loss, results in a complete loss of braking function. In the course of his testimony, Andrews observed the obvious advantage of the dual system. He further testified that as of the date of the trial and, in fact, since 1967, all Ford automobiles were equipped with dual master brake assemblies.

William Strejan, a quality-control engineer of the defendant Ford, examined the master cylinder from this car and testified that he found no defect and that he found a residual amount of fluid. His examination was some 2 years after the accident. This witness had no opportunity to, nor did he, examine the brake lines, any fittings, nor any other components of the system except for a damaged power booster.

Upon this appeal, Ford argues that there is no proof of a specific defect and that the mere proof of a malfunction is not sufficient to sustain the verdict of the jury. Defendant relies upon *Shramek v. General Motors Corp.*, 69 Ill.App.2d 72, 216 N.E.2d 244. In that case, a tire blew out. No specific defect was established and the tire was unavailable for examination as of the time of the trial. *Van Winkle v. Firestone Tire & Rubber Co.*, 117 Ill.App.2d 324, 253 N.E.2d 588, is a like case except there the tire was produced at trial. These cases relating to tire blowouts are not persuasive here. A tire can suffer a blowout from causes unrelated to a defect in the tire. For purposes of Illinois products liability law, the Illinois Supreme Court has discussed the word "defect" in considerable detail, and in *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401, stated:

> "Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function. So, Chief Justice Traynor has suggested that a product is defective if it fails to match the average quality of like products. (Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn. L.Rev. 363 (1965).) The Restatement emphasizes the viewpoint of the consumer and concludes that a defect is a condition not contemplated by the ultimate consumer

which would be unreasonably dangerous to him. (Restatement, Torts (Second) § 402A, comment g.) Dean Prosser has said that 'the product is to be regarded as defective if it is not safe for such a use that can be expected to be made of it, and no warning is given.' (Prosser, The Fall of the Citadel, 50 Minn. L.Rev. 791, 826.) Dean Wade has suggested that apart from the existence of a defect 'the test for imposing strict liability is whether the product is unreasonably dangerous, to use the words of the Restatement. Somewhat preferable is the expression "not reasonably safe." ' (Wade, Strict Tort Liability of Manufacturers, 19 S.W. Law Journal 5, 15.) See also, Dean Keeton, Products Liability—Liability without Fault and the Requirement of a Defect, 45 Tex.L.Rev. 855, 859." (42 Ill.2d 339, 342-43, 247 N.E.2d 401, 403.)

In this connection, the court in *Bollmeier v. Ford Motor Co.*, 130 Ill. App.2d 844, 265 N.E.2d 212, observed that machinery that malfunctions lacks fitness for its intended use and quoted with approval from a Federal case to the effect that the "sin" or defect is lack of fitness as evidenced by the malfunction itself, rather than some specific dereliction by the manufacturer in constructing or designing the machinery.

■■ We concur in the statement found in *Lindroth v. Walgreen Co.*, 407 Ill. 121, 94 N.E.2d 847, and quoted with approval in *Bollmeier* that in products liability cases, as in negligence cases, "reasonable inferences may be drawn from established facts and all that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a satisfactory conclusion." 407 Ill. 121, 134.

■■ Thus, the essential ingredients for a products liability case as stated in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182, are to be found in this record. Here the plaintiff's evidence establishes that his injury resulted from a condition of the product, that the condition was unreasonably dangerous and that evidence clearly supports the jury's conclusion that the condition of the product existed when the product left the manufacturer's control. Under such circumstances, the malfunction makes it lacking in fitness for its clearly intended use and it is defective without reference to evidence establishing a specific identifiable defect other than the fact of the malfunction. Indeed, to impose upon the plaintiff the burden of proving a specific identifiable defect other than the uncontroverted malfunction here shown would effectively nullify policy considerations clearly stated in *Suvada*:

"[T]hat public interest in human life and health,: the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present and as compelling in cases involving motor vehicles and other products, where the defective condition makes them unreasonably dangerous to the user, as they are in food cases." (32 Ill.2d 612, 619, 210 N.E.2d 182, 186.)

Indeed, this philosophy underlies the assault upon and the fall of the citadel.

■■ Ford urges that a verdict against it and in favor of the retailer based upon a defect in the product sold by each in the ordinary chain of commerce is inconsistent and cannot stand. It is true in a products liability cases where the retailer has been found not guilty and the distribution system. (*Dunham.*) A retailer found guilty has indemnification against the manufacturer. (*Suvada; Texaco, Inc. v. McGrew Lumber Co.,* 117 Ill. App. 2d 351, 254 N.E.2d 584.) There are products liability cases where the retailer has been found not guilty and the manufacturer guilty. (See *Nolan v. Shaf Manufacturing Co.,* 128 Ill. App.2d 19, 261 N.E.2d 209; *Moore v. Jewel Tea Co.,* 116 Ill.App.2d 109, 253 N.E.2d 636.) In this case, Ford offered an instruction that clearly indicated to the jury that it could find one or both of the defendants liable. The language of the instruction likewise contemplated finding of damages against "one or both" defendants. Thus, we need not further discuss the contention of an asserted inconsistent verdict.

Other issues are presented by Ford relating to the giving and refusing of instructions and to portions of the closing argument of the plaintiff. We have examined these issues, find no necessity for discussing them in detail, and conclude that no reversible or prejudicial error is found in the record. Accordingly, the judgment of the circuit court of Vermilion County entered upon the verdict of the jury is affirmed.

Judgment affirmed.

SIMKINS, P. J., and SMITH, J., concur.