**Norman TOLBERT, Respondent,**

v.

**GERBER INDUSTRIES, INC., defendant and third-party plaintiff, Appellant,**

**and**

**VOLDCO, INC., defendant and third-party plaintiff, Respondent,**

v.

**SCHULER GRAIN COMPANY, third-party defendant, Respondent.**

No. 45290.

Supreme Court of Minnesota.

April 22, 1977.

---

**3.** Rule 6.02, subd. 3, which provides for a prerelease investigation of an accused's background in order to determine the conditions of release on bail, provides in part: " * * * Any information obtained from the defendant in response to an inquiry during the course of the [prerelease] investigation and any evidence de-

rived from such information, shall not be used against the defendant at trial." This is an example of the manner in which our Rules of Criminal Procedure embrace the constitutional guarantees as enunciated in *Miranda v. Arizona, supra.* See, also, Rule 5.01(b).

**364**

Field, Arvesen, Donoho, Lundeen & Hoff and Norman D. Arvesen, Fergus Falls, for appellant.

Rufer, Hefte, Pemberton, Schulze & Sorlie and Richard C. Hefte, Fergus Falls, Jardine, Logan & O'Brien, St. Paul, for Tolbert.

Clemmensen & Robertson, Breckenridge, Bey, Ochs & Klimek, Minneapolis, Dosland, Dosland, Nordhaugen & Mickelberg and J. R. Dosland, Moorhead, for Voldco.

Korbel & Gospodar and Anthony C. Gospodar, Breckenridge, for Schuler.

Heard before OTIS, PETERSON, and SCOTT, JJ.; reheard, considered, and decided by the court en banc.

OTIS, Justice.

This is an action brought by Norman Tolbert against Gerber Industries, Inc. (Gerber), the manufacturer, and Voldco, Inc. (Voldco), the installer of defective equipment which caused plaintiff's injury. Schuler Grain Company (Schuler), Tolbert's employer, was made a third-party defendant. The jury found that Gerber and Voldco were negligent and that the negligence of each was a direct cause of Tolbert's injury and awarded Tolbert $60,572. Pursuant to our comparative negligence statute, Minn.St. 604.01, the jury was instructed to attribute a percentage of negligence to each tortfeasor. They attributed 100 percent of the negligence to Gerber and Voldco jointly and did not apportion percentages between them. The trial court, relying upon our recent decisions in *Hillman v. Ellingson*, 298 Minn. 346, 215 N.W.2d 810 (1974), and *Sorenson v. Safety Flate, Inc.*, 298 Minn. 353, 216 N.W.2d 859 (1974), thereupon awarded Voldco 100-percent indemnity from Gerber. We reverse and remand for further proceedings.

The issue presented is one which prompts us to re-evaluate well-established common-law rules in light of recently adopted principles of comparative negligence. Specifically, the question is whether a negligent installer of defective equipment is entitled to 100-percent indemnity from the negligent manufacturer because the negligence of the former was "passive" or "secondary," or whether the joint tortfeasors should be responsible for the loss in accordance with their respective degrees of culpability.

In 1968, Schuler, a corporation operating a grain-and-seed elevator, contracted with Voldco, a corporation engaged in the construction of grain elevators and the installation of grain-handling equipment, to design and install a trackside loading leg to permit gravity loading of grain hopper cars on a railroad siding immediately adjacent to one of Schuler's plants.

Schuler outlined its requirements, and Voldco determined what equipment was needed, selected a supplier, and obtained and installed the equipment.

Voldco gave Gerber the basic information concerning the type of system required, and Gerber determined what specific components would be needed. Gerber prepared a sketch showing the height of the leg and the length of the transfer spout necessary to reach the open-top hatches of hopper cars. In addition, it determined the angles of an A–valve and a metal elbow. Gerber then shipped all component parts, separately and unassembled, to Voldco and received payment.

The installation consisted of a hollow tube some 30 feet high, mounted vertically

alongside the track on which railroad cars would be loaded. Inside the tube, which was supported by bracing to hold it upright, was a power-driven conveyor belt to which cups were attached to raise grain from the bottom of the column to other equipment at the top of the column. Grain was fed to the belt at the bottom of the column from storage bins in the Schuler structure.

At the top of the column the grain cups emptied into an A-valve which was to carry the grain out toward the hopper car at an angle below the horizontal. The grain then flowed by gravity to an elbow which changed its direction to the descending vertical. Bolted to the lower end of the elbow was a metal turnhead, so-called because, within a circular motion in the center of the upperplate bolted to the elbow, it was designed to turn 360 degrees in rotation. Below the circular turnplate, the turnhead, which consisted of a cast-metal pipe, sent the grain downward at an angle between the horizontal and the vertical into a metal transfer spout approximately 12 feet in length, having articulating segments just below its point of attachment to the transfer spout. Attached to the transfer spout was a metal sleeve which could be extended for another 12 feet, to produce a total spout length from the turnhead of about 24 feet. This sleeve could be retracted by a crank-operated cable and pulley with a ratchet release to permit extension from a retracted position without operation of the crank.

The hopper car was metal, its roof level being some 12 or 15 feet above track level. Down the center of the roof and running lengthwise was a three-segment open channel into which the transfer spout and its extension were to be placed to fill three separate bins, each open segment of the channel serving one bin and having a separate door segment which covered the channel segment when closed. The car was about 40 feet in length and, when spotted for loading, was centered on the loading-leg structure which loaded the grain.

The top segment of the transfer spout was attached to the turnhead by hooking a hole in the spout to a cast-metal lug on the turnhead. The turnplate was designed to be mounted in a level horizontal valve to the base of the elbow above it, and the angles of the A-valve and the elbow had to coincide for a level installation. If the turnplate was not installed in a level position, it permitted the hole in the transfer spout to slip off the lug on the turnhead, allowing the entire transfer spout and sleeve assembly to fall free from its point of suspension 30 feet above ground level.

In preparing its sketch, Gerber, the manufacturer, determined that the proper angle of the A-valve was 35 degrees. By mistake, its shipping department sent a 47-degree angle instead. As a result, the turnplate was tilted 12 degrees below the horizontal at its outer edge toward the hopper car. Voldco, the installer, had not ordered specific component parts but rather had ordered a complete system, leaving to Gerber the decision as to what parts were needed. Voldco has been in the business of installing systems such as this since 1947 or 1948, and had installed "quite a few" of them. It proceeded to install the equipment sent by Gerber without detecting its potentially dangerous propensities.

On January 8, 1972, Tolbert was on top of a hopper car extending the transfer spout and its sleeve to the west end of the car centered at the base of the loading leg on an east-west track. In this process, the hole in the head of the transfer spout disengaged from its point of suspension on the lug of the turnhead and fell to the ground, sweeping the plaintiff off the top of the hopper car, causing him severe injuries.

There were no safety devices on the transfer-spout suspension to prevent its falling in the event of disengagement. Gerber had never produced a system with any such safety device, Voldco had never installed one with safety devices, and Schuler had never seen such a device or ordered the installation of one. If a safety device were installed, it would have had the unwanted effect of making permanent that which was intended to be portable. The system was designed to move the transfer spout from turnhead to turnhead as differ-

ent commodities were loaded into railroad cars. Gerber, Voldco, and Schuler had no knowledge of any occurrences of unintentional disengagements, although similar equipment had been installed in grain elevators throughout the country.

■ In *Hendrickson v. Minnesota Power & Light Co.,* 258 Minn. 368, 372, 104 N.W.2d 843, 848 (1960), we reviewed our decisions concerning indemnity between joint tortfeasors[1] and adopted the following rules:

" * * * A joint tortfeasor may generally recover indemnity only in the following situations:

"(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.

"(2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged.

"(3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

"(4) *Where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged.*

"(5) Where there is an express contract between the parties containing an explicit undertaking to reimburse for liability of the character involved." (Italics supplied.)

■ The instant case falls within Rule 4 of *Hendrickson.* In situations covered by Rules 1, 2, and 3, the party who seeks indemnity has been held liable even though not personally at fault. In cases under Rule 1, the liability of the party seeking indemnity is imposed upon him for the conduct of another.[2] Indemnity in such a case is supported by the fundamental principle that one who is guilty of injurious misconduct is himself liable therefor.[3] In cases under Rule 2, indemnity is granted to a party who justifiably relied upon representations made by another and thus is without personal fault, but whose actions are nevertheless tortious.[4] In cases under Rule 3, the party seeking indemnity is again without personal fault,[5] but is exposed to liability because of the failure of another to perform a duty which he was legally or contractually obligated to perform. Rule 5 deals with contractual indemnity and is thus distinguishable from Rules 1, 2, and 3 and from Rule 4.

Cases which fall under Rule 4 are of a very different type from the others. Aside from cases of contractual indemnity, the other rules concern parties seeking indemnity who are without personal fault, but who nevertheless are liable in tort. Rule 4, however, concerns parties who are themselves culpably negligent but who nevertheless seek to avoid responsibility for the injury

1. As we use the term "joint tortfeasors" it includes "all cases where there is joint liability for a tort, whether the acts of those jointly liable were concerted, merely concurrent, or even successive in point of time." Leflar, Contribution and Indemnity Between Tortfeasors, 81 U. of Pa.L.Rev. 130, 131 note 9.

2. Restatement, Restitution, § 96, refers to a party seeking indemnity who is "without personal fault." See, *Keefer v. Al Johnson Construction Co.,* 292 Minn. 91, 193 N.W.2d 305 (1971); *Lunderberg v. Bierman,* 241 Minn. 349, 63 N.W.2d 355 (1954).

3. Leflar, *supra,* footnote 1, p. 147.

4. Restatement, Restitution, § 90. See also, Restatement, Restitution, §§ 89, 91, and 92. Leflar, *supra,* footnote 1, p. 150, describes such a party as one who "voluntarily but innocently and in good faith [does] at the direction of another person an act which on its face appears lawful and proper, but which is in fact tortious * * *." See, *Henderson v. Eckern,* 115 Minn. 410, 132 N.W. 715 (1911); *Guirney v. St. Paul, Minneapolis & Manitoba Ry. Co.,* 43 Minn. 496, 46 N.W. 78 (1890).

5. Restatement, Restitution, § 98(a) states that such a party must be "without fault." Restatement, Restitution, § 98(b), comment *b* reveals that that subsection is but a special case of the vicarious liability treated in § 96. See, also, Leflar, *supra,* footnote 1, p. 158; *Minneapolis Mill Co. v. Wheeler,* 31 Minn. 121, 16 N.W. 698 (1883).

they have caused. The typical example of this is where the party seeking indemnity has failed to discover or prevent the negligence or misconduct of another when an ordinarily prudent person would have done so.[6] Previously, the rule has been interpreted to apply where the negligence of the party seeking indemnity was merely "passive" or "secondary" as contrasted with the "active" or "primary" negligence of the other tortfeasor.

Our current rule on indemnity in Rule 4 situations presents a trial court with a bewildering array of issues. First, the Court must determine if the negligence of the party was "passive" or "secondary" as opposed to the "active" or "primary" negligence of the other tortfeasor.[7] Next the Court is expected to decide whether the negligence was "concurrent," in which case contribution and not indemnity is awarded. *Thill v. Modern Erecting Co.,* 272 Minn. 217, 136 N.W.2d 677 (1965); *White v. Johnson,* 272 Minn. 363, 137 N.W.2d 674 (1965). It also must examine "the relative culpability of the conduct of the wrongdoers," but still it must award indemnity on an all-or-nothing basis. *Hillman v. Ellingson,* 298 Minn. 346, 350, 215 N.W.2d 810, 813 (1974). Finally, it is admonished that such indemnity cannot be determined by "hard-and-fast rules and must turn on the facts of each case." *Sorenson v. Safety Flate, Inc.,* 298 Minn. 353, 361, 216 N.W.2d 859, 864 (1974).

Indemnity provides a just result in cases under Rules 1, 2, and 3. Its application insures that liability for damages is borne by the negligent party. It prevents those only vicariously liable from bearing an unfair burden thrust upon them by others (i. e., tortious acts by servants or employees, people driving cars with the owner's consent, or anyone for whose negligence another is held to be liable under the law). In Rule 4 cases, however, indemnity is a blunt instrument for reallocating responsibility for damages.[8] It shifts the entire loss from one culpable wrongdoer to another.[9]

In the related area of contributory negligence, our legislature has abandoned the all-or-nothing approach of the common law by adopting a comparative negligence statute, Minn.St. 604.01. Tortfeasors must now accept responsibility for damages commensurate with their own relative culpability. Because indemnity in Rule 4 situations is an equitable doctrine,[10] we are at liberty to ameliorate the rigid common-law rules in keeping with legislative philosophy without an express statutory mandate.

By limiting the reallocation of loss between joint tortfeasors to contribution based upon relative fault, the more culpable tortfeasor will continue to bear a greater share of the loss, but at the same time his joint tortfeasor will not continue to escape all liability as in the past. We were invited to adopt such a rule in *Bjorklund v. Hantz,*

**6.** See, Restatement, Restitution, §§ 93, 94, 95; Leflar, *supra,* footnote 1, p. 154. *Hillman v. Ellingson,* 298 Minn. 346, 215 N.W.2d 810 (1974); *Bjorklund v. Hantz,* 296 Minn. 298, 208 N.W.2d 722 (1973); *White v. Johnson,* 272 Minn. 363, 137 N.W.2d 674 (1965); *Fidelity & Cas. Co. v. Northwestern Tel. Exch. Co.,* 140 Minn. 229, 167 N.W. 800 (1918); *City of Wabasha v. Southworth,* 54 Minn. 79, 55 N.W. 818 (1893).

**7.** We note that these distinctions may well have occurred from dicta, rather than from the holdings of some of our earlier decisions. For example, *Lunderberg v. Bierman,* 241 Minn. 349, 63 N.W.2d 355 (1954), was a case wherein the party seeking indemnity was liable only because the negligence of another was imputed to her by law, yet we nevertheless drew the "active/passive" distinction. Likewise, in *Keefer v. Al Johnson Construction Co.,* 292

Minn. 91, 193 N.W.2d 305 (1971), the party seeking indemnity was only vicariously liable, yet we went on further to use the "primary/secondary" distinction.

**8.** Wade, Comments on *Maki v. Frelk,* 21 Vand. L.Rev. 938, 941.

**9.** Note, 65 Col.L.Rev. 123, 126; Jensvold, A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases, 58 Minn.L.Rev. 723, 737.

**10.** The principles governing indemnity between joint tortfeasors grew out of the doctrines of quasi-contract and unjust enrichment. Restatement, Restitution, Part I, Introductory Note; *Hendrickson v. Minnesota Power & Light Co.,* 258 Minn. 368, 370, 104 N.W.2d 843, 846 (1960).

296 Minn. 298, 208 N.W.2d 722 (1973), and now accept it.[11]

The jury found that both Gerber and Voldco were negligent and that the negligence of each was a direct cause of plaintiff's injury. Consequently, as between them, each will bear the cost of compensating plaintiff in proportion to its relative culpability.

The judgment of the district court is affirmed in so far as it awards plaintiff judgment against defendants Gerber and Voldco and dismisses the third-party claims against Schuler. With respect to the award to Voldco of indemnity against Gerber, the judgment is reversed and the matter is remanded for a new trial on the limited issue of apportionment of liability between Gerber and Voldco in accordance with the rule we here adopt.

Reversed and remanded.

KELLY, Justice (dissenting).

I respectfully dissent from the opinion of the court. In addition to the issue of negligence, the jury had submitted to it issues involving strict liability and implied warranty of fitness for the purpose. The jury found that the equipment involved here was in a defective condition and unreasonably dangerous to the user when it left the hands of both Gerber and Voldco and that the defective condition was the cause of Tolbert's injuries. It also found that there was a breach of implied warranty by both defendants and that these breaches were a direct cause of the injury to Tolbert. Thus, it appears that the liability of the defendants here was based not only on negligence, but also on strict liability and breach of implied warranty.

I dissent for two reasons. First, I believe that fundamental fairness and sound economic principles of loss allocation among tortfeasors support indemnity from the manufacturer in the instant case where an installer's negligence consists only of failure to discover a product defect (1) which is not obvious in the process of installation and (2) which directly results from breaches of contract and implied warranty by the manufacturer to deliver a specified product for a particular known purpose. Second, although there is merit in the policy objective underlying the court's decision to allocate responsibility among joint tortfeasors based on their comparative negligence, the court would unreasonably extend that decision to remove from the arsenal of a court of equity seeking to do economic and social justice among tortfeasors the flexibility inherent in an appropriate use of common-law indemnity. Indemnity is only one weapon among many. Standing alone it gives the appearance of inflexibility because it is all-or-nothing. However, as one of many equitable and legal remedies, it adds to the flexibility of our judicial system. Indemnity is not the real culprit it is made out to be. Instead, it is our adherence to archaic rules of law that do not permit the use of contribution where fundamental fairness would require it. In doing away with indemnity, we would surrender the equitable powers of the court in virtually all cases and thrust upon the jury an additional and complex task in civil litigation—the task of considering social and economic principles and allocating losses fairly and efficiently. Ironically, the court would effect such a surrender at a time when increasing numbers of legal thinkers are proposing limitations on the functions of the civil jury or even its abolition.[1]

---

11. New York and Wisconsin have adopted similar rules. *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972); *Pachowitz v. Milwaukee & Suburban Transport Corp.,* 56 Wis.2d 383, 202 N.W.2d 268 (1972).

Decisions reaching a contrary conclusion in the following cases are necessarily overruled: *Hillman v. Ellingson,* 298 Minn. 346, 215 N.W. 2d 810 (1974); *Bjorklund v. Hantz,* 296 Minn. 298, 208 N.W.2d 722 (1973); *White v. Johnson,* 272 Minn. 363, 137 N.W.2d 674 (1965); *Hen-*

*drickson v. Minnesota Power & Light Co.,* 258 Minn. 368, 104 N.W.2d 843 (1960) (in part); *Fidelity & Cas. Co. v. Northwestern Tel. Exch. Co.,* 140 Minn. 229, 167 N.W. 800 (1918); *City of Wabasha v. Southworth,* 54 Minn. 79, 55 N.W. 818 (1893).

1. An interesting article in 59 Judicature, May 1976, p. 478, entitled "Jury Confusion: A Threat to Justice" brings into question the ability of a jury to understand the laws it is expected to apply.

At the outset, I would agree that there is a certain facial attractiveness in the court's simple premise, that negligent tortfeasors should pay according to their relative culpability. As a general rule, such a premise provides equity and justice in the majority of tort cases. However, there remains a narrow class of cases, including the five categories listed in *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 372, 104 N.W.2d 843, 848 (1960), in which fairness demands that liability be shifted entirely from the shoulders of some tortfeasors and onto those of others. I believe the instant case is one of those cases since it falls squarely within the fourth category in *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 373, 104 N.W.2d 843, 848 (1960):

> "Where the one seeking indemnity [the installer] has incurred liability merely because of failure, *even though negligent*, to discover or prevent the misconduct of the one sought to be charged [the manufacturer]." (Italics supplied.)

The specific facts of this case illustrate the fairness of the "discovery" category. It is undisputed that the injury to plaintiff occurred because Gerber, the manufacturer, sent the wrong part to Voldco, the installer. Although the part appeared to fit properly in the installation of the loading leg, if Voldco would have carefully examined the installation when completed, it could have noted the greater elbow angle and, applying principles of physics, could have recognized the greater possibility of disengagement with this angle. Because it is the policy of our laws to protect and compensate innocent persons who are injured by defective products, negligence liability is found against both the installer and the manufacturer. However, this extension of our negligence law to protect a plaintiff should not be dispositive in determining the rights of installer and manufacturer inter se. Thus, while one might infer from the evidence in this case that the experienced installer, Voldco, should have recognized the danger of a greater elbow angle, such an inference

justified only a finding of negligence on the part of Voldco and its joint and several liability to plaintiff, it does not justify denial of indemnity from Gerber, the manufacturer of the component parts. The record reveals that while Gerber proposed and promised to deliver an elbow with a 35-degree angle, the elbow it actually provided had a 47-degree angle. This failure to deliver the correct part was a direct breach of Gerber's contractual obligation to Voldco and the natural and proximate cause of all of the damages arising from this action. Thus, while both Voldco and Gerber may be responsible to plaintiff, as between themselves, Gerber has breached a contractual obligation and should be responsible to Voldco for the results of that breach, including all the costs and damages of this lawsuit. See, *Daly v. Bergstedt*, 267 Minn. 244, 126 N.W.2d 242 (1964); *Fidelity & Cas. Co. v. Northwestern Tel. Exch. Co.*, 140 Minn. 229, 167 N.W. 800 (1918).

Gerber's conduct may also be characterized as a breach of its implied warranty that its product is fit for the purpose intended by the parties. Minn.St. 336.2–315. That warranty ran directly to Voldco and was breached when Gerber provided a product with an incorrect, dangerous elbow angle which was not fit for use as a loading leg. Whether a contract or warranty theory is applied in this case, Gerber breached an obligation running to Voldco and should be required to indemnify Voldco for the consequences of that breach. We are not just changing common-law equitable principles, but also statutory enactments involving contract law.

Restatement, Restitution, § 95, which in my view governs this case, provides:

> "Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was *created by the misconduct of the other or which, as between the two, it was the other's duty to make safe*, he is entitled to restitution from the other for expenditures properly

made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition." (Italics supplied.)

As between an installer and a supplier, it is the duty of the supplier to supply the correct part, and the installer should be able to rely on the supplier's performance of that duty where the part supplied actually fits and appears to be correct in all respects. In such a situation, the installer should be entitled to indemnity.

Indemnification in the instant case is also supported by sound economic and social policies. The loss in an accident situation should fall on the party who can, with the minimum cost, (1) take the precautions necessary to avoid the accident and (2) insure and spread the loss. That party is clearly the manufacturer in the instant case. It is in the best position to have knowledge concerning its own product, which it placed into the stream of commerce in a defective condition. By double checking its parts, instructions, and diagrams and perhaps improving employee selection and supervision, it could have avoided this loss with a minimum of cost. The manufacturer, as a larger operation than its installers, distributors, and retailers, is in the best position economically to secure adequate insurance. In contrast, the installer could have prevented this accident only by seeking further knowledge of the manufacturer's product, by making extra inspections, and by taking extra precautions against the manufacturer's errors. The installer is less likely to be able to insure against product defects efficiently. In fact, many general liability policies which apply to installers contain products liability exclusions. The installer is not a very efficient insurer of the manufacturer's defects. The Illinois Supreme Court recently upheld a finding of indemnity in a case somewhat similar to this one. It refuted the rationale used by the majority in this case and explained its rationale in the following terms:

" * * * [T]he present case involves the question of indemnification between two manufacturers, the producer of the defective component part and the assembler of the finished product, both of whom could have been sued directly in strict liability by the injured party. Defendant urges that since the compensation of a consumer injured by a defective product or held liable for injury caused by the product is not involved in such a situation, the two manufacturers should simply be treated as joint tortfeasors, with no indemnity allowed unless one's negligence is active and the other's passive. We cannot agree. *The major purpose of strict liability is to place the loss caused by defective products on those who create the risk and reap the profit by placing a defective product in the stream of commerce, regardless of whether the defect resulted from the 'negligence' of the manufacturer.* We believe that this purpose is best accomplished by eliminating negligence as an element of any strict liability action, including indemnity actions in which the parties are all manufacturers or sellers of the product. As one authority has observed: 'In many jurisdictions, the right of contribution between joint tortfeasors is denied if they are at equal fault, but not denied if the tortfeasor seeking contribution was only passively negligent. The difficulty of applying this test to strict liability cases is that negligence is irrelevant for determining liability. It is a liability based upon the placing into commerce of a product which if defective, is likely to be unreasonably dangerous under normal use. There is, therefore, no reason why the responsibility should not trace back to the originally responsible party. Since privity is not relevant in strict liability cases, the injured party could have sued the manufacturer, just as well as the party down the distributive chain who sold the product to the injured user. *The manufacturer should not be able to escape liability because of this fortuitous selection of defendants by the injured party, and the immediate seller, if sued by the buyer, should be able to get in-*

*demnity from the manufacturer.'* 2 L. Frumer and M. Friedman, Products Liability, sec. 16A(4)(b)(i)." (Italics supplied.) *Liberty Mutual Ins. Co. v. Williams Machine & Tool Co.,* 62 Ill.2d 77, 81, 338 N.E.2d 857, 859 (1975).

An Illinois appellate court also awarded indemnity in a similar context, making a comment relevant to the instant case:

" * * * The record makes clear that Harvester placed the defective product in the stream of commerce with knowledge of its intended use. While Woods failed to warn Frisch of the dangers of pressure and vibration and of the importance of securing the cap, *this failure merely continued a defect created by Harvester.*" (Italics supplied.) *Frisch v. International Harvester Co.,* 33 Ill.App.3d 507, 522, 338 N.E.2d 90, 102 (1975).

Likewise, in the instant case, the installer merely continued a defect created by the manufacturer, which should bear ultimate responsibility for its product.[2]

Even if one were to concede that the majority opinion presents a somewhat plausible result on the facts of the instant case, the sweeping nature of the opinion and its direct contravention of both law in the majority of jurisdictions and former Minnesota law are extremely disturbing. The majority opinion discards well-established principles of equity among joint tortfeasors in favor of jury discretion, overruling a long line of Minnesota cases. The remedy of indemnity has long been used in Minnesota[3] and elsewhere[4] to accomplish justice in a wide variety of factual situations. The majority discounts the collective experience and development of the law in all of these cases in favor of two recent cases—one in New York[5] and one in Wisconsin[6]—both of which repudiate active/passive or primary/secondary distinctions but neither of which abolishes "failure to discover" indemnity or deals with a manufacturer/installer or similar products liability situations. It is not clear that the New York court, for example, intended to preclude the possibility of full indemnity in products liability cases. See, *Langford v. Chrysler Motors Corp.,* 373 F.Supp. 1251 (E.D.N.Y.1974), which applied the *Dole* case to grant full indemnity where a dealer did not create a product defect and could not have discovered it. The majority would use this questionable authority to limit indemnity to a very narrow class of situations and thereby destroy one of its most important attributes—flexibility in securing a fair apportionment of loss among tortfeasors in widely varying circumstances. See, Prosser, Torts (4th ed.), § 51, p. 313.

The lack of flexibility in the majority opinion will create problems in future cases. In this case, both the manufacturer and the installer were found liable under theories of negligence, breach of implied warranty, and

2. Such a continuation of a manufacturer's defect is distinctly different from independent and concurring negligence on the part of the middleman which constitutes an additional cause of plaintiff's injury, e. g., negligent repair. In such a case, contribution is appropriate because the middleman's liability does not result solely from a failure to discover the manufacturing defect. *Kenyon v. F. M. C. Corporation,* 286 Minn. 283, 176 N.W.2d 69 (1970).

3. See, e. g., *Hillman v. Ellingson,* 298 Minn. 346, 215 N.W.2d 810 (1974); *Bjorklund v. Hantz,* 296 Minn. 298, 208 N.W.2d 722 (1973); *Keefer v. Al Johnson Construction Co.,* 292 Minn. 91, 193 N.W.2d 305 (1971); *Kenyon v. F. M. C. Corporation,* 286 Minn. 283, 176 N.W.2d 69 (1970); *Jack v. Applebaum's Food Markets, Inc.,* 280 Minn. 247, 158 N.W.2d 857 (1968); *White v. Johnson,* 272 Minn. 363, 137 N.W.2d 674 (1965); *Hanson v. Bailey,* 249 Minn. 495, 83 N.W.2d 252 (1957); *Fidelity & Cas. Co. v. Northwestern Tel. Exch. Co.,* 140 Minn. 229, 167 N.W. 800 (1918).

4. Recent cases from other jurisdictions upholding indemnity in products liability cases analogous to this one include: *Tweedy v. Wright Ford Sales, Inc.,* 31 Ill.App.3d 72, 334 N.E.2d 417 (1975); *Hales v. Green Colonial, Inc.,* 402 F.Supp. 738 (W.D.Mo.1975); *Smith Radio Communications, Inc. v. Challenger Equipment Ltd.,* 270 Or. 322, 527 P.2d 711 (1974).

5. See *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972).

6. See, *Pachowitz v. Milwaukee & Suburban Transport Corp.,* 56 Wis.2d 383, 202 N.W.2d 268 (1972).

strict liability, and the majority holds that only contribution is allowed. What if the case had been submitted on strict liability alone? What if one or both parties had breached an express warranty? What if breach of an express written contractual provision were involved? Regardless of any problems posed by such questions, the majority would presume to do justice in all future cases by allowing a jury discretion in allocating losses, a result, I predict, which will cause a greater spreading of loss among tortfeasors at the expense of economic and social policies favoring complete shifting of liability.

For the reasons stated above, I would hold that the trial court was correct in granting indemnity to the installer Voldco and thus avoid the possible and probable problems of the majority's sweeping approach.[7]

ROGOSHESKE, Justice (dissenting).

I join Mr. Justice Kelly's dissenting opinion, emphasizing my belief that full indemnity should continue to be allowed where liability is predicated on strict liability or breach of warranty. Where liability is based solely on findings of causal negligence of a manufacturer and a retailer or installer, I would agree with the majority that apportionment should be allowed under the policy embodied in our comparative negligence statute, Minn.St. 604.01, and that *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 104 N.W.2d 843 (1960), should be modified accordingly. Since the liability of the manufacturer in this case was also based on findings of strict liability and breach of implied warranty, it should not be able to escape full responsibility for damages caused by its defective product solely because of the fortuity of plaintiff's allegation of negligence and the jury's additional finding of joint negligence for reasons so well expressed by my brother Kelly. The majority opinion, I assume, applies only where liability of the manufacturer and the retailer or installer is based on negligence, since the jury's findings as to strict liability and breach of warranty are utterly ignored. If my assumption is incorrect and apportionment of fault is to be extended to defective product cases where liability is based on breach of warranty or strict liability, apportionment of fault would require a wholly different comparison of the fault-producing relationship between the parties. Factors such as size and technical expertise surely would be important considerations in assessing relative culpability between, for example, a large manufacturer and a small neighborhood variety store or one-man installer. I doubt that an intelligible rule or jury instruction could be fashioned which would permit a jury to apply equitable principles necessarily required to justly apportion liability. I suspect that any attempt to do so would demonstrate that the apportionment issue in cases where liability is based on other than negligence is, and should remain, one to be resolved by the court.

TODD, Justice (dissenting).

I join in the dissents of Mr. Justice Kelly and Mr. Justice Rogosheske.

YETKA, Justice (dissenting).

I join in the dissents of Mr. Justice Kelly and Mr. Justice Rogosheske.

---

7. See, O'Donnell, Implied Indemnity in Modern Tort Litigation: The Case for a Public Policy Analysis, 6 Seton Hall L.Rev. 268.